[Cite as *State v. Jones*, 2020-Ohio-281.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,             :        APPEAL NO. C-170647
                                       TRIAL NO. B-1602671

      Plaintiff-Appellee,       :

                                         *O P I N I O N.*

   vs.                               :

EARL JONES,                     :

      Defendant-Appellant.      :

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  January 31, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Scott M. Heenan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy Young,* Ohio State Public Defender, and *Peter Galyardt,* Assistant State Public Defender, for Defendant-Appellant.

**CROUSE, Judge.**

{¶1}  Defendant-appellant Earl Jones appeals his convictions for aggravated murder and carrying a concealed weapon.  In his appeal, Jones raises nine assignments of error for our review.  For the reasons set forth below, we affirm in part and reverse in part the judgment of the trial court.

### Facts and Procedure

{¶2}  In 2012, defendant-appellant Earl Jones fathered a child with Cyerra Prather.  Jones and Prather dated for the next three years and eventually ended their relationship in October 2015.  Approximately two months later, in December 2015, Prather began dating Kevin Neri.  From January 2016 to May 2016, Neri lived with Prather and her family.

{¶3}  There was instant animosity between Jones and Neri.  Jones regularly referred to Neri through racial epithets and directed vulgar insults at both Neri and Prather.  Because of the relationship between Jones and Neri, Prather's family took various steps to reduce the chances for confrontation.  For example, Prather's mother acted as an intermediary for the pick-up and drop-off of Jones and Prather's son. Prather's mother would drop their son off at Jones's apartment and she would meet Jones outside when he returned their son to Prather's house.  In addition, Prather's family attempted to make transfers of the child quick.  Prather's family wanted to reduce the time Jones had to wait at Prather's house and reduce the chances of Jones and Neri seeing each other.

{¶4}  Jones and Neri also had a history of arranging fist fights that never occurred.  Jones would tell Neri to meet him at a specific location, Neri would go to that location, and Jones would not be there.  A similar set of circumstances occurred on May 16, 2016.  Throughout the morning and early afternoon of May 16, Jones and Neri

exchanged several taunting and derogatory text messages. During the exchange, Neri asked Jones if Jones wanted to fight. Jones replied in the affirmative, stating that he would be in the area the following day to pick up his and Prather's son.

{¶5} Around 4:00 p.m., Jones asked Prather if he could get their son that night instead of the following day. Prather agreed and Jones asked that Prather bring their son to his apartment. Prather stated that her sister would drop the child off at Jones's apartment. However, Prather's sister refused when she found out that Jones had posted half-naked pictures of Prather on social media earlier in the day. Prather instead offered Jones to pick their son up from her house at 8:00 p.m. Jones agreed and immediately texted Neri to reschedule the previously-arranged fight to occur at the same time Jones would be at Prather's house. Neri agreed to meet Jones at the end of the street.

{¶6} At 7:29 p.m., Jones messaged Prather to ask when he should leave. Prather responded, "I thought you were gonna be here by 8." Jones replied, "Making sure you'll still be home by 8." At 7:55 p.m., Jones again messaged Prather stating, "Im stopping by my friend ruths house first he lives around the corner from you." Jones then called Prather at 8:09 p.m. to confirm that he had left his friend's house and was on his way to Prather's house.

{¶7} Jones arrived at Prather's house around 8:10 p.m. Jones parked his car on the right side of the street in front of Prather's mailbox, an area designated as a no-parking zone. According to the state's witnesses, Neri was outside standing in the yard when Jones arrived. Jones pocketed a loaded firearm and got out of the car, leaving the engine running and the driver's side door open. The two men began walking towards each other. Jones then pulled the firearm out of his pocket and shot Neri three times. Jones immediately returned to his car, called 9-1-1 to report the shooting, and turned himself in to the local sheriff's station.

**{¶8}** Jones was subsequently indicted on one count of aggravated murder in violation of R.C. 2903.01(A), one count of murder in violation of R.C. 2903.02(A), one count of felony murder in violation of R.C. 2903.02(B), and one count of carrying a concealed weapon in violation of R.C. 2923.12(A)(2). Despite his claims of self-defense, a jury found Jones guilty of all counts and the trial court sentenced him to life imprisonment without the possibility of parole. Jones timely filed this appeal and raised the following assignments of error:

1. Earl Jones's Conviction for Aggravated Murder Under R.C. 2903.01(A) is Not Supported by Sufficient Evidence, and the Trial Court Erred When it Denied his Crim.R. 29 Motion.

2. Earl Jones's Conviction for Aggravated Murder is Not Supported by the Manifest Weight of the Evidence.

3. The Trial Court Violated Earl Jones's Constitutional Right to Present a Complete Defense.

4. The Trial Court Erred When it Admitted Photographs That Were Both Misleading and Substantially More Prejudicial than Probative.

5. Earl Jones's Defense Counsel Was Constitutionally Ineffective.

6. The Trial Court Erred When it Denied Earl Jones's Mistrial Request.

7. The Trial Court Erred When it Admitted Prejudicial Photographs.

8. The Trial Court Erred When it Sentenced Earl Jones to Life Without the Possibility of Parole Despite the Fact that the Record Clearly and Convincingly Did Not Support Such a Punitive Sentence, and R.C. 2953.08(D)(3) is Unconstitutional if it Prohibits Appellate Review of Earl's Sentence.

9.   The Cumulative Effect of the First, Second, Third, Fourth, Fifth, Sixth,

and Seventh Assignments of Error Denied Earl Jones a Fair Trial.

We find the first, third, fourth, seventh, and ninth assignments of error dispositive of this appeal, and therefore, the other five assignments of error are rendered moot.

### *Law and Analysis*

### I.   *Sufficiency of the Evidence*

{¶9}   In his first assignment of error, Jones argues that his conviction for aggravated murder was based upon insufficient evidence.  Jones contends that he did not act with the requisite "prior calculation and design."

{¶10}   To determine whether a conviction is supported by sufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991).

{¶11}   Jones was convicted of aggravated murder under R.C. 2903.01(A), which states:   "No person shall purposely, and with prior calculation and design, cause the death of another."   " '[P]rior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' which was required under prior law."  *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph one of the syllabus.  As noted by the Ohio Supreme Court in *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), "the phrase 'prior calculation and design' [was employed] to indicate studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim."  "All prior calculation and design offenses will necessarily include purposeful homicides; not all purposeful

5

homicides have an element of prior calculation and design." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18.

{¶12} In this case, the state does not argue that Jones, with prior calculation and design, decided to shoot Neri after Jones pulled up in his car and saw Neri in the front yard. And the evidence would be insufficient to prove prior calculation and design under those circumstances. *See id.* ("Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of * * * a studied consideration of the method and the means to cause a death."). Rather, the state contends that Jones went to Prather's home with prior calculation and design to kill Neri, having formed the intent to kill earlier that day.

{¶13} The Ohio Supreme Court has repeatedly held that "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *Taylor* at 20. In determining whether prior calculation and design exists, courts are guided by three factors: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events'?" *Id.* at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist. 1976).

{¶14} In light of the *Taylor* factors, we find that the evidence does not support the jury's determination of prior calculation and design. It is undisputed that Jones and Neri knew each other and that the relationship was severely strained. However, a strained relationship alone is not enough to support a conviction for

aggravated murder. Rather, the existence of a strained relationship must be considered in light of the other *Taylor* factors.

{¶15} In support of its argument that Jones went to Prather's house with the prior calculation and design to kill Neri, the state points to evidence that Jones engaged in what Prather described at trial as "weird" behavior of repeatedly verifying when he was to pick up his son. The state contends that parking his car on the "wrong" side of the street, leaving the car engine running, and pocketing a loaded firearm that he had in the car is evidence of prior calculation and design. In addition, the state emphasizes the fact that Jones shot Neri three times while advancing on him, including after Neri tried to flee. The state lastly points to the testimony of one of the witnesses who claimed that Jones smiled at Prather after he shot Neri.

{¶16} While we believe the state presented sufficient evidence that Jones purposefully killed Neri, the state's theory of prior calculation and design is unsupported by the evidence. There is simply no evidence that Jones planned Neri's murder before he arrived at Prather's residence, i.e., that he engaged in a studied consideration of the method, means, or location of the killing.

{¶17} The plan that existed the night of May 16 was a fistfight up the street, not a murder at Prather's house. The uncontroverted evidence showed it was Neri who initially challenged Jones to a fistfight. The extraction report of Jones's cell phone recounts the following conversation on the morning and early afternoon of the shooting:

Neri: So are you tryna hit or no?

Jones: I'll be there tomorrow

* * *

7

Neri:  Don't flake lil boy

Jones:  I'll be there about 4 30

* * *

Neri:  Come a lil early.  I'm sure you don't want MY son to watch you get your ass beat

Jones:  I got work lil boy man meet me somewhere low key just you its going to be just me were going to settle this boi I dont want my son there or your lil friends just you and me

* * *

Neri:  Meet me at the end of cyerras street tomorrow

Jones:  Ill be there around 4 30 lil boy

{¶18}  Approximately three and a half hours later, Jones messaged Prather asking to pick their son up that night instead of the following day.  The following conversation took place:

Jones:  Im off tomorrow can I pick the baby up and have him stay then ill take him to baseball tomorrow and drop him off after baseball

* * *

Prather:  You can come around 8

Jones:  What do you have going on today?

Jones:  Like could you drop him off

Prather:  At 8?

Jones:  Or whenever your done doing what your doing

Prather:  My sister will drop him off at 8

{¶19}  The next contact between Jones and Prather occurred approximately an hour and a half later.  Prather informed Jones that her sister could not drop their

son off at Jones's residence, but instead Jones could pick him up at her house at 8:00 p.m. Jones accepted the invitation and then messaged Neri to reschedule the previously-arranged fight. Specifically, Jones asked Neri if he was going to be at Prather's residence that night at 8:00 p.m. and Neri responded, "You meet Neil [sic] the street." Jones replied, "Just meet me at the top of the street."

{¶20} The only other contact between Jones and Prather is the "weird" behavior to which the state alludes. At 7:29 p.m., approximately two hours after their previous conversation, Jones asked Prather, "When should I leave?" Prather responded, "I thought you were gonna be here by 8." Jones replied, "Making sure you'll still be home by 8." At 7:55 p.m., Jones again messaged Prather stating, "Im stopping by my friend ruths house first he lives around the corner from you." Jones then called Prather at 8:09 p.m. to confirm that he had left his friend's house and was on his way to Prather's house.

{¶21} Based on the uncontroverted text messages and call log, it is clear that Jones did not choose the time or location of the shooting. In fact, the record is completely devoid of any evidence that Jones knew Neri would be at Prather's residence when he arrived. Instead, the text messages demonstrate Jones's deliberate avoidance of Neri. Jones initially asked for his son to be dropped off at his apartment. When Prather's sister refused, Prather offered Jones to pick their son up at Prather's house at 8:00 p.m.—i.e., Prather's chosen time. Jones agreed and immediately rescheduled the fight with Neri to occur earlier than originally planned—i.e., at the same time he was supposed to get his son. Per Neri's earlier suggestion, Jones told Neri to meet him at the end of Prather's street. It defies logic to conclude that Jones's plan was to shoot Neri in the front yard of his ex-girlfriend's house with witnesses around and his child present. This is especially true given

9

Jones's earlier statements that he wanted to meet Neri "somewhere low key" and that he did not want his son or Neri's friends there.

{¶22}  The dissent argues that arranging for a fight up the street rendered it likely that Neri would be nearby, suggesting that the jury could infer that Jones's plan was to shoot Neri if he ran into him that night.  However, even a planned contingency to kill is not evidence of a preconceived plan to kill.  *See State v. Noggle*, 140 Ohio App.3d 733, 749, 749 N.E.2d 309 (3d Dist.2000) (holding that "merely being prepared to kill if the situation calls for it does not amount to prior calculation and design"), citing *State v. Reed*, 65 Ohio St.2d 117, 418 N.E.2d 1359 (1981) ("The statements appellant made to a classmate that he would kill any police officer who got in his way of a crime he might commit do not show that appellant designed a scheme in order to implement a calculated decision to kill.").

{¶23}  The parties do not dispute that Jones had a loaded firearm in the car. However, Ohio courts have consistently held that "mere possession of a weapon is not, without more, evidence of prior calculation and design."  *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578; *see State v. Johnson*, 10th Dist. Franklin No. 97APA03-315, 1998 WL 226441 (May 5, 1998).  This is especially true where the evidence demonstrated that Jones frequently carried a weapon.  According to Prather, Jones owned guns and always talked about the right to carry a gun.  In addition, Jones introduced a police report into evidence wherein Jones reported a handgun stolen from the center console of his car.  The fact that Jones, upon seeing Neri standing in the front yard, pocketed the firearm and exited from the vehicle, even when viewed in the light most favorable to the prosecution, does not demonstrate more than instantaneous deliberation.

{¶24} With respect to the third factor, the state points to evidence that Jones walked towards Neri, pulled the weapon out of his pocket, shot Neri three times, got back in his car, and drove away. Even viewed in a light most favorable to the prosecution, this demonstrates only Jones's anger at the moment. The uncontroverted evidence indicates that the time between Jones arriving at Prather's house and driving to the police station was a span of one to two minutes. The extraction report of Jones's cell phone details that Jones called Prather at 8:09:11 p.m. to confirm that he was on his way to her house. The call lasted for one minute and 15 seconds, placing Jones's arrival at Prather's house a little after 8:10 p.m. Jones first attempted to call 9-1-1 at 8:12:38 p.m. Although a jury could reasonably infer that Jones purposely decided to shoot Neri in that span of time, the length of time is insufficient to infer prior calculation and design.

{¶25} "Aggravated murder is a purposeful killing that *also* requires proof of prior calculation and design: forethought, planning, choice of weapon, choice of means, and the execution of the plan." *Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, at ¶ 28. "The element of prior calculation and design requires evidence that supports more than the inference of purpose. Inferring prior calculation and design from an inference of purpose is mere speculation." *Id.* at ¶ 26. Finding prior calculation and design on the facts of this case will blur the line between planned killings and purposeful killings to the point where there will no longer be a difference between the two. This is not the type of case envisioned by the General Assembly when it adopted the more stringent requirement of "prior calculation and design."

{¶26} Even when all the evidence is viewed in a light most favorable to the prosecution, the jury could not have reasonably found the required element of prior

calculation and design. In this case, there was sufficient evidence that Jones had the purpose to kill, but not a plan to kill. Therefore, the evidence was insufficient to support a conviction for aggravated murder.

{¶27} Jones's first assignment of error is sustained.

## II. Evidentiary Errors

{¶28} In several assignments of error, Jones contends that the trial court committed four major evidentiary errors that deprived him of his constitutional right to a fair trial. In his third assignment of error, Jones argues that the trial court violated his constitutional right to present a complete defense when it erroneously excluded favorable "state-of-mind" evidence, including (1) social media postings by Neri, (2) statements from Jones's relatives describing threats made by Neri against Jones, and (3) the race of Jones's extended family members. In his fourth and seventh assignments of error, Jones argues that the trial court erred when it admitted irrelevant and prejudicial photographs of guns and ammunition found in Jones's bedroom. In his ninth assignment of error, Jones argues that the cumulative effect of these errors denied him a fair trial. Thus, Jones argues that that the exclusion of certain evidence and the inclusion of other evidence, either alone or in combination, violated his constitutional right to a fair trial.

### 1. Admission of Photographs

{¶29} We begin with Jones's fourth and seventh assignments of error, in which Jones argues that the trial court erred when it admitted prejudicial photographs of guns and ammunition found in Jones's bedroom during a search. Jones contends the photographs were irrelevant, or if relevant, more prejudicial than probative and improper under Evid.R. 404(B). Because these assignments of error raise similar issues, we will address them together.

12

**{¶30}** The admission of evidence is within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. To find an abuse of discretion, we must find that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶31}** Prior to trial, Jones filed a motion in limine to exclude photographs of guns and ammunition interspersed among children's toys and other child-specific items located throughout Jones's bedroom on the day of the shooting. The trial court correctly granted the motion because the photographs were irrelevant to the charges against Jones, and prejudicially portrayed Jones as a violent person and a bad father.

**{¶32}** Evid.R. 404(B) precludes evidence of other acts "to prove the character of a person in order to show action in conformity therewith." The Ohio Supreme Court has held that the introduction of other-weapons evidence—i.e., irrelevant evidence of weapons unrelated to the charges—falls within the scope of Evid.R. 404(B). *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821. Therefore, other-weapons evidence must be excluded when it leads only to inferences about the defendant's dangerous character. *Id.* at ¶ 41; *see, e.g., State v. Carusone*, 1st Dist. Hamilton No. C-010681, 2003-Ohio-1018 (holding that the trial court erred in admitting "other acts" evidence that defendant had "always carried a gun" and that he had previously fired a gun at other people on other occasions); *State v. Crosby*, 186 Ohio App.3d 453, 2010-Ohio-1584, 928 N.E.2d 795, ¶ 16 (8th Dist.) (evidence of another gun the defendant was known to have carried "does not link defendant to the gun used to shoot the victim, and was therefore improperly admitted").

{¶33}  Jones argues that the trial court erred in finding that defense counsel "opened the door" to the introduction of the photographs during his cross-examination of Detective Stockmeier when the following exchange took place:

Defense counsel:  Is this area where I am pointing, that is the safe that is the subject in the photo, right?

Stockmeier:  Yes, sir.

Defense counsel:  Where was it located in the closet?

Stockmeier:  That's up on a shelf that is mounted to the wall.

Defense counsel:  All right.  We are about the same height.  So approximately our eye height?

Stockmeier:  Yeah.

Defense counsel:  So if you had a small child, that would be a good place to put it?

Stockmeier:  Sure.

{¶34}  After this exchange, the state argued that admission of the photographs was necessary to rebut defense counsel's "touting [of Jones's] gun safety and child-rearing skills."  Based on defense counsel's questions, the court determined that counsel "implied" that "[Jones] was this * * * stellar guy, that was protecting his kid."  Specifically, the court ruled that defense counsel "opened the door to character."

{¶35}  However, whether Jones was "parent of the year" is not probative of the issue of whether he purposely murdered Neri or justifiably acted in self-defense.  "Opening the door is one thing.  But what comes through the door is another."  *United States v. Winston*, 447 F.2d 1236, 1240 (D.C.Cir.1971).

[T]he doctrine [of opening the door] is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. * * * The introduction

of otherwise inadmissible evidence under the shield of this doctrine is permitted only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.

(Internal quotations omitted.) *State v. Bronner*, 9th Dist. Summit No. 20753, 2002-Ohio-4248, ¶ 73. *Accord United States v. Beno*, 324 F.2d 582, 588-589 (2d Cir.1963) ("[I]t makes little sense to insist that once incompetent evidence is erroneously admitted, the error must of necessity be compounded by 'opening the door' so wide that rebutting collateral, inflammatory and highly prejudicial evidence may enter the minds of the jurors.").

{¶36} We disagree that such a brief implication during cross-examination, that perhaps could be interpreted to imply that Jones was a "stellar guy" with good "gun safety and child-rearing skills," put Jones's character into issue such that irrelevant and unnecessarily prejudicial photographs could come into evidence. No unfair prejudice to the state resulted from defense counsel's brief question during cross-examination. Thus, the trial court abused its discretion in admitting the photographs.

{¶37} Crim.R. 52(A) requires us to next determine whether this error was harmless. *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). "If a court determines that the error did not affect the defendant's substantial rights, then the error is harmless and shall be discarded." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23.

{¶38} In *Morris*, the Ohio Supreme Court set out a three-part test to determine the effect of the errors: (1) "[T]here must be prejudice to the defendant as a result of the admission of the improper evidence at trial"; (2) "an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt"; and (3) "in determining whether * * * the error is harmless beyond a reasonable doubt, the court

15

must excise the improper evidence from the record and then look to the remaining evidence." *Id.* at ¶ 27-29. The *Morris* court cautioned that "our role upon review of [the] case is not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony on the jury." *Id.* at ¶ 29.

{¶39} As this court observed in *State v. Benson*, 1st Dist. Hamilton No. C-180128, 2019-Ohio-3255, ¶ 24, "[t]he [harmless-error] analysis usually turns on the consideration of the strength of the remaining evidence." In general, evidentiary errors by the trial court are harmless if "such evidence would not tend to negate overwhelming proof of defendant's guilt." *State v. Gilmore*, 28 Ohio St.3d 190, 193, 503 N.E.2d 147 (1986).

{¶40} However, Jones presented a theory of self-defense at trial. The Ohio Supreme Court has consistently recognized self-defense as a "justification for admitted conduct." *State v. Poole*, 33 Ohio St.2d 18, 19, 294 N.E.2d 888 (1973); *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166 (1987). In other words, a defendant claiming self-defense "admits the facts claimed by the prosecution and then relies on independent facts or circumstances which the defendant claims exempt him from liability." *Martin* at 94. "Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged." *Id.*

{¶41} Therefore, when a defendant asserts the affirmative defense of self-defense, an appellate court cannot determine whether the errors are harmless simply by looking at the strength of the remaining evidence. In such a case, the impact of the offending evidence on the verdict becomes a bigger focus. As stated in *Morris*, "blatant prejudice may override even a strong case and require a new trial." *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 32.

16

{¶42} We have already found that there was insufficient evidence to support a conviction for aggravated murder. Thus, it is impossible to say that the other evidence against Jones was overwhelming. The evidence certainly was sufficient for the jury to find that Jones purposely killed Neri. And Jones did not dispute the existence of those elements. Instead, Jones sought to justify his actions on the ground that he acted in self-defense.

{¶43} Under these circumstances, Jones's credibility was crucial to his defense. Jones testified about his version of the facts and his belief that he needed to act in self-defense. Indeed, it would have been very difficult to prove Jones's state of mind at the time of the shooting without Jones's testimony. The state does not deny that it sought to introduce the photographs in order to negate Jones's claim that he feared Neri was armed and dangerous. In its appellate brief, the state contends that "these photos were introduced to show that Jones' alleged concerns about Neri were a sham."

{¶44} In addition to the prejudicial nature of the evidence, the state capitalized on the trial court's improper rulings in its closing argument. As both the Ohio Supreme Court and this court have noted, "the actions of a prosecutor may combine with an evidentiary error to cause greater impact." *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 31; *State v. Hall*, 1st Dist. Hamilton No. C-170699, 2019-Ohio-2985, ¶ 27. We are specifically concerned with the following remarks:

[Jones] had no honest fear of [Neri]. * * * He is so scared of little Wayne being around [Neri] and his guns, yet when you get the exhibits back in the jury room take a look at Exhibit Number 22. Take a look at Exhibit Number 22. Take a look at the shotgun that he just has laying out on the wall. If he is a good dad—remind yourself, if he is a good dad, he doesn't want to have his kid around guns, be in danger, but the shotgun is laying

17

out against the wall, the shells and the .38 rounds are on the—in the bedroom on the mattress with the toys and the child's sheets on it. But he doesn't want Wayne to be around [Neri], because he has got guns. It's a little contradictory.

Based on these statements, there is no question that the state highlighted the improper evidence for the jury. There is also no question that the improper evidence prejudiced Jones. It is clear that the other-weapons photographs unfairly hampered Jones's credibility. The photographs undermined Jones's character by prejudicially portraying him as a violent person and a bad father, and ultimately, undermined Jones's theory of defense.

{¶45} However, we need not answer whether this error alone was not harmless beyond a reasonable doubt because we examine this error in conjunction with the additional evidentiary errors discussed in the next section. "Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

2. Exclusion of "State-of-Mind" Evidence

{¶46} In Jones's third assignment of error, he argues that the trial court violated his constitutional right to present a complete defense when it excluded certain "state-of-mind" evidence.

{¶47} "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment * * * or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, * * * the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683, 690, 106

18

S.Ct. 2142, 90 L.Ed.2d 636 (1986), citing *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). A criminal defendant's constitutional right to present a complete defense includes the right to offer the testimony of witnesses and to present the defendant's version of the facts. *Washington* at 19. However, "[t]he accused does not have an unfettered right to offer testimony that is * * * inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). A defendant's right to present a defense is violated only when the court prevents him from introducing evidence essential to his defense. *Crane* at 690.

{¶48} In determining whether a defendant's constitutional right to present a complete defense was violated, we must first determine whether there was a valid reason to limit the excluded evidence. *See Montana v. Engelhoff*, 518 U.S. 37, 53, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (explaining that the Court's holding in *Crane*, which concluded that the exclusion of certain evidence violated the defendant's constitutional rights, "rested not on a theory that all 'competent, reliable evidence' must be admitted, but rather on the ground that the Supreme Court of Kentucky's sole rationale for the exclusion . . . was wrong.").

> [T]he exclusion of defense evidence violates a defendant's constitutional right to present a defense only where it is "arbitrary" or "disproportionate," that is, where "important defense evidence" is excluded without serving "any legitimate interests" or in a manner that is "disproportionate to the ends that [the rationale for exclusion is] asserted to promote."

*United States v. Reichert*, 747 F.3d 445, 453 (6th Cir.2014), quoting *Holmes v. South Carolina*, 547 U.S. 319, 324-326, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

### a. Threats against Jones.

{¶49} Jones argues that, in order to show his state of mind at the time of the offense, he should have been permitted to testify that his father and aunt told him about an incident where Neri made threatening statements against Jones while possessing a gun. Jones contends that the trial court erred in holding that such statements were hearsay, and therefore, Jones could not testify about them.

{¶50} During direct examination, defense counsel asked Jones, "[D]id you ever have any other information that gave you reason to believe that [Neri] might be armed?" The state objected on hearsay grounds. At sidebar, defense counsel proffered that Jones's father told Jones of an incident where Neri threatened Jones while armed with a weapon. Defense counsel further proffered that Jones's aunt "will testify that [Neri] came looking for [Jones] at the apartment while armed with a weapon." When the court asked if Jones's father was testifying, defense counsel replied, "Yes, ma'am." In response, the court ruled in the following manner: "[Y]ou can ask, were you told something? Who told you? My father. My aunt. And leave it at that. And they can testify to what it was." Defense counsel never called Jones's father or aunt to testify.

{¶51} We agree with Jones that his testimony about the threat was not hearsay because it was not offered to prove the truth of the matter asserted. Evid.R. 801(C). Rather, the testimony was offered to provide a basis for Jones's state of mind and his alleged fear that Neri was armed and dangerous. In *State v. Wetherall*, 1st Dist. Hamilton No. C-000113, 2002 WL 440700, *7 (Mar. 22, 2002), this court held that testimony by the accused concerning specific instances of violent conduct by the victim is admissible to prove the accused's state of mind at the time of his offense. *See State v.*

*Roth*, 1st Dist. Hamilton No. C-030303, 2004-Ohio-374 ("[A] defendant must be allowed to present evidence of a victim's propensity for violence when the defendant is putting forth the affirmative defense of self-defense."); *State v. Levett*, 1st Dist. Hamilton No. C-040537, 2006-Ohio-2222. When evidence of specific instances of violent conduct are offered to show the accused's state of mind, the proponent of the evidence need only show that the accused had prior knowledge of the conduct. *Wetherall* at *7.

{¶52} Therefore, Jones should have been allowed to testify about any known prior instances of Neri's violent behavior to demonstrate his state of mind at the time of the shooting. The trial court's rationale for excluding the testimony, i.e., that it was hearsay, was erroneous.

**b. Social media postings.**

{¶53} Jones argues that he should have been permitted to introduce into evidence social media postings by Neri to show Jones's state of mind at the time of the offense, particularly to show that Jones had reason to fear that Neri was reaching for a gun.

{¶54} During trial, Jones sought to admit numerous Twitter posts by Neri involving violence, guns, and drugs to show why Jones believed Neri was armed with a weapon at the time of the shooting. The state objected on relevancy grounds to the admission of any posts by Neri. After further discussions at side bar, the state maintained its objection to any posts concerning drugs and drug dealing, but withdrew its objection to any posts concerning guns and violence.

{¶55} For the sake of clarity, the court asked the state to read into the record the exhibit numbers of those posts to which it maintained an objection. Specifically, the state objected to nine exhibits, which included the following Twitter posts:

Send them boys from O-Block to come shoot up yo whole block

21

Rather be a dope boy, I really love sellin shit

Them 12 bricks they can make you rich

Nigga that's a hand gun, we bringing out the choppa

When I get too bored I go out back with this rifle and hunt small creatures while I smoke

People lie that's why I just take actions over words eventually I'll stop caring or trying

If anyone in that car live, just tell that nigga I owe him

[A]sking me to pull up with a sack without even asking for the price

Mfs think I'm a lick or sumn

Ain't no salary cap in the dope game

They bouta put me in population with the nigga that got Manny shot and left him to die.  Putting him down on sight

[I]t's a surface wound

I gotta talk myself out of smoking my whole blunt on break

Good dope sell itself

The state argued, and the trial court agreed, that "[t]here is nothing in any of those tweets * * * that lends itself to an essential element of self-defense."  Therefore, the court excluded the Twitter posts.

{¶56}   In the same fashion, the court asked the state to read into the record the exhibit numbers of those posts to which it withdrew an objection.  Specifically, the state did not object to nine exhibits, which included the following Twitter posts:

[Picture of Prather's car with bullet holes.]

I'm zoned cause dude pulled up next to me with tha strap if his lap.  Soon as he upped it I hit skkrt and he start dumping his whole clip.

6 head shots I'll erode a nigga

I gotcho life right here on my hip

22

Took off soon as them bands hit my lap

My uzi it weighed a ton

[W]hen I got out to look at the car, I found this [bullet] stuck to my hip

[M]fs started bussing at me last night

Niggas swear they shooters but don't even know how to hold a strap

Always keep a black tool cause bullies aren't bulletproof

Based on the state's decision to withdraw its objection, the court stated that it felt it had no choice but to admit those posts into evidence.

{¶57} As discussed above, evidence concerning specific instances of violent conduct by the victim, of which the accused had prior knowledge, is admissible to prove the accused's state of mind at the time of his offense. *Wetherall*, 1st Dist. Hamilton No. C-000113, 2002 WL 440700, at *7. Here, the court arbitrarily admitted certain Twitter posts pertaining to guns and violence, while arbitrarily excluding other Twitter posts pertaining to guns and violence. For example, the court excluded posts such as "Send them boys from O-Block to come shoot up yo whole block"; "Nigga that's a hand gun, we bringing out the choppa"; and "They bouta put me in population with the nigga that got Manny shot and left him to die. Putting him down on sight." As discussed in more detail later, Jones particularly takes issue with the court's exclusion of the May 12 post, "If anyone in that car live, just tell that nigga I owe him." Jones contends that this post was relevant to his state of mind because it was "an apparent vengeful threat suggestive of lethal violence against someone" and because it was the most recent Tweet, posted only four days before the shooting.

{¶58} We agree with Jones that the trial court's reliance on the state's delineation of admissible and inadmissible evidence resulted in an arbitrary and unreasonable ruling. It is clear from the record that the trial court excluded the

introduction of any exhibits to which the state objected, and permitted the introduction of any exhibits to which the state did not object. Based on the arbitrary nature of the ruling, we find that the trial court erred in excluding posts pertaining to guns and violence.

{¶59} The exclusion of the Twitter posts pertaining to drugs and drug dealing is a closer call. Jones contends that the Twitter posts were relevant because guns are commonly equated with illegal drug sales, and his defense was based on Neri's violent nature and Jones's fear that Neri was going to shoot him. However, the trial court expressed concern that Jones was attempting to simply besmirch Neri's character by labeling him as a drug dealer, and stated that the admission of evidence that Neri might have sold drugs was irrelevant.

{¶60} It is true, as Jones argues, that Ohio courts have frequently found that drug dealing and guns go hand in hand. *See, e.g., State v Nevins*, 2d Dist. Montgomery No. 24070, 2011-Ohio-389, ¶ 43 ("We also note that Officer Riegel testified that in his experience as a police officer in the narcotics division, it was common to find guns on or near individuals involved in illegal drug sale or manufacture in order to protect them because they are frequently robbed for the drugs or money."); *State v. Harry*, 12th Dist. Butler No. CA2008-01-0013, 2008-Ohio-6380, ¶ 52 (noting as common fact that "drugs and weapons are often found within close proximity to one another"). However, we cannot say that the trial court's exclusion of the Twitter posts about drugs and drug dealing amounted to an unreasonable or arbitrary ruling.

{¶61} At trial, Jones did not base his defense on the fact that Neri was allegedly involved with drugs. Jones did not argue that the shooting occurred as the result of a drug deal gone wrong. Jones also did not claim that Neri appeared intoxicated on the night of the shooting. Moreover, the record shows that Prather had already testified that

24

Neri sold marijuana. Therefore, the court did not abuse its discretion in excluding the Twitter posts pertaining solely to drugs and drug dealing.

    **c. Race of Jones's family members.**

{¶62} Jones argues that he should have been permitted to testify about the race of his relatives to explain his motives in using racial epithets towards Neri.

{¶63} During direct examination, defense counsel asked Jones, "You saw the language that you are using here?" Jones replied,

> Yeah. I mean, we have all seen it. It is definitely inappropriate. Honestly, I think inappropriate is not a good enough word for it. It's degrading, disrespectful. And, I mean, I have people of color in my family.

* * *

> I feel like my language has definitely disrespected people in my family, you know, and I'm ashamed of it.

The state objected and the trial court sustained the objection, asking defense counsel to "direct a question at his own feelings versus his family."

{¶64} We find that the trial court properly concluded that the statements were irrelevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. In determining relevance, we look to the elements of the offense charged and whether the evidence tends to prove or disprove any material element. *State v. Gardner*, 59 Ohio St.2d 14, 20, 391 N.E.2d 337 (1979).

{¶65} Testimony concerning the race of Jones's relatives was not relevant to show Jones's state of mind as an element of the crimes charged. The fact that the race of

25

his relatives may have motivated Jones to choose one word over another had no bearing on whether he purposely murdered Neri or justifiably acted in self-defense. Rather, Jones's statements were calculated to create sympathy for him.

{¶66} Moreover, the record shows that Jones did testify about his motives in using racial epithets towards Neri. The court allowed into evidence the following testimony:

Defense counsel: It is more than disrespectful, pretty hateful language?

Jones: I agree.

Defense counsel: The purposes of that is what?

Jones: Just they are insults. I wanted to hurt somebody with my words.

Defense counsel: Okay. Why did you choose the word nigger?

Jones: It's the lowest blow that you can make. You can't—I mean, in my mind I don't think you can get no lower than that. And, I mean, what we all know about life, and I knew that word was going to stick.

{¶67} Under these circumstances, the trial court's decision to exclude testimony about the race of Jones's family members was neither arbitrary nor wrong.

### 3. Jones's Right to Present a Complete Defense Was Violated

{¶68} Having determined that the trial court erred in excluding Jones's testimony about an incident where Neri made a threat against Jones while possessing a gun and certain Twitter posts by Neri about guns and violence, we must now determine whether the exclusion of this evidence violated Jones's constitutional right to present a complete defense.

{¶69} The errors will only amount to a constitutional violation if they deprived Jones of a fair trial. In order to determine if the trial was fair, this court must examine whether the defendant had "a meaningful opportunity to present a complete defense."

*Trombetta*, 467 U.S. at 485, 104 S.Ct. 2528, 81 L.Ed.2d 413. In determining whether the opportunity was "meaningful," the United States Supreme Court has examined whether a defendant's "defense was far less persuasive than it might have been" had the excluded evidence been admitted. *See Chambers*, 410 U.S. at 294, 93 S.Ct. 1038, 35 L.Ed.2d 297. Specifically, the Supreme Court has examined whether the excluded evidence was "critical," "vital," or "central" to the defense. *Id.* at 302 (finding that the defendant's constitutional right to present a complete defense was violated because the excluded evidence was "critical" to his defense); *Washington*, 388 U.S. at 16, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (finding that the excluded evidence would have been not only relevant and material, but "vital to the defense"); *Crane*, 476 U.S. at 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (finding that the blanket exclusion of evidence concerning the circumstances of the defendant's confession violated his constitutional right to present a complete defense because the "evidence is central to the defendant's claim of innocence").

{¶70} Thus, in determining whether Jones's constitutional right to present a complete defense was violated, we must examine the excluded errors in the context of the entire case. When there are multiple errors, we need not examine each individual error in isolation. *See Chambers* at 298 ("We need not decide, however, whether this error alone [limitation of cross-examination of a key witness] would occasion reversal since Chambers' claimed denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses."). "[E]rroneous evidentiary rulings can, in combination, rise to the level of a due process violation." *Engelhoff*, 518 U.S. at 53, 116 S.Ct. 2013, 135 L.Ed.2d 361.

{¶71} To determine the impact of the erroneous exclusion of evidence, courts typically engage in some sort of harmless-error analysis. For instance, in *Crane*, the state argued that "any error was harmless since the very evidence excluded by the trial

27

court's ruling ultimately came in through other witnesses." *Crane* at 691. Although the Court declined to address the merits of the state's harmless-error argument, it agreed that the erroneous ruling was subject to a harmless-error analysis and remanded the case to the state court to conduct such an analysis.

{¶72} Like in *Crane*, the state here argues that any error was harmless because the trial court allowed Jones to admit other state-of-mind evidence. For example, when asked why he shot and killed Neri, Jones replied, "I thought that [Neri] was going to kill me that day." The court then allowed into evidence nine Twitter posts by Neri concerning violence and firearms. When asked about those posts, Jones stated that they concerned him because "[i]t indicates * * * that [Neri] is involved with guns and potentially violent." The court also allowed Jones to testify concerning two specific instances of violent conduct by Neri prior to the shooting. In the first instance, Jones testified that, two weeks prior to the shooting, Neri "[stood] up out of the driveway" and "yell[ed] for [him]" as he drove past. In the second instance, Jones testified that, three days prior to the shooting, he drove past Neri while Neri "had his shirt off, arms raised in the air, with a gun on his hip."

{¶73} But the fact that a defendant was able to present some evidence of his defense is not dispositive of whether the error was harmless. *See, e.g., McDonald v. United States*, 904 A.2d 377, 381 (D.C.Cir.2006) ("Because McDonald's testimony about his injuries would have been neither unduly repetitive nor irrelevant, we are constrained to conclude that the trial judge abused her discretion in precluding it. Moreover, the error resulted in an unconstitutional deprivation of McDonald's right to present a complete defense."); *State v. Ciacchi*, 8th Dist. Cuyahoga No. 92705, 2010-Ohio-1975, ¶ 18, 25 ("Although Ciacchi was able to provide limited testimony about the victim propositioning him and was able to cross-examine the victim, he was not afforded his

right to present a complete defense" because "he was precluded from testifying in detail about what the victim stated to him on the street and while at her apartment."); *O'Neal v. Balcarcel*, 933 F.3d 618, 627 (6th Cir.2019) (exclusion of a third-party jailhouse confession to the murder, while in part cumulative to other evidence already admitted at trial, "very well could have been the straw that broke the camel's back in establishing a reasonable doubt as to [defendant's] guilt"); *Hawkins v. United States*, 358 U.S. 74, 80, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958) (declining to find an error harmless even though it was "in part cumulative" when it pertained to "a sharply contested issue of fact which, on the evidence in the record, the jury could have resolved either way depending largely" on which party it believed). A "meaningful" opportunity to present a complete defense "must be full and fair, not arbitrarily and significantly curtailed." *McDonald* at 381.

{¶74} To prove self-defense, Jones had to establish that he had "a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force." *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus.[1] Because Ohio has adopted a subjective standard for determining whether a defendant acted in self-defense, "[t]he defendant's state of mind is crucial to this defense." *State v. Purcell*, 107 Ohio App.3d 501, 505, 669 N.E.2d 60 (1st Dist.1995); *State v. Koss*, 49 Ohio St.3d 213, 215, 551 N.E.2d 970 (1990). In fact, the sole contested issue at trial was Jones's state of mind at the time of the shooting.

{¶75} With regard to the exclusion of Jones's testimony that Neri was looking for him with a gun, Jones argues that this was a threat that Jones believed was directly aimed at him. Furthermore, this was the third incident that Jones claims made him

---

[1] We recognize that R.C. 2901.05 was revised during the pendency of this action, and self-defense is no longer an affirmative defense in Ohio.

believe Neri was armed and dangerous. The state, and the dissent, counter that Jones was not prevented from presenting a complete defense because the court stated it would allow the testimony through Jones's father and aunt.

{¶76} Certainly, pursuant to *Wetherall*, testimony by corroborating witnesses concerning specific instances of violent conduct by the victim is admissible to prove the accused's state of mind at the time of an offense. *Wetherall*, 1st Dist. Hamilton No. C-000113, 2002 WL 440700, at *7. Thus, Jones's father and aunt could have testified about the statements. But this does not negate the fact that it was error to preclude Jones himself from testifying about the statements. Clearly, "the most important witness for the defense in many criminal cases is the defendant himself." *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

{¶77} With regard to the Twitter posts, Jones argues that they were relevant to his state of mind because they were "suggestive of lethal violence against someone." Although Jones was permitted to enter several of Neri's Twitter posts into evidence regarding guns and violence, the court arbitrarily excluded a Twitter post from May 12, just four days before the shooting. This may not have been significant in light of the other Twitter posts that were admitted, except for the fact that the state capitalized on the trial court's improper ruling in its closing argument. We are specifically concerned with the following remarks by the prosecutor during closing argument:

> There was no honest belief on the part of the defendant that he was in immediate or imminent danger. He wants you to believe that [he] saw all of those tweets and posts from Kevin and he was scared. First of all, take a look at all of this. They are from December, January, March. Not from May 13, 14, 15, not from that day, two days, a week, or even a month before this happened.

30

But one of the improperly-excluded posts was from May 12, four days before the shooting.

{¶78} Jones's testimony about a particular incident of Neri looking for him with a gun on his hip and the May 12 Twitter post were critical, vital, and central to Jones's affirmative defense of self-defense because they evidenced his state of mind at the time of the shooting. The erroneous exclusion of this evidence made Jones's defense far less persuasive than it might have been had the excluded evidence been admitted. Because we cannot say the exclusion of this evidence was harmless beyond a reasonable doubt, the trial court's improper exclusion of Jones's state of mind evidence violated his constitutional right to present a complete defense.

### 4. Cumulative Error

{¶79} We also agree with Jones's ninth assignment of error that the cumulative effect of the evidentiary errors denied Jones a fair trial. The jury's determination of guilt rested solely on whether it believed Jones. The exclusion of the state-of-mind evidence and the inclusion of prejudicial character evidence, which was emphasized by the state during closing argument, made Jones's testimony and theory of the defense "far less persuasive." We cannot be sure that these evidentiary errors did not tip the scale against Jones on the close and vital issue of his state of mind. Under these circumstances, we cannot say, beyond a reasonable doubt, that the cumulative effect of the errors was harmless.

{¶80} Accordingly, Jones's third, fourth, seventh and ninth assignments of error are sustained.

### *Summary*

{¶81} In sum, we sustain Jones's first, third, fourth, seventh, and ninth assignments of error. Assignments of error two, five, six, and eight, which concern

alleged errors that occurred during trial and at sentencing, are thereby rendered moot. Consequently, we reverse Jones's aggravated-murder conviction under R.C. 2903.01(A), discharge Jones from further prosecution on that underlying count, and remand the cause for a new trial on the remaining murder counts under R.C. 2903.02(A) and 2903.02(B). Because Jones has failed to raise any assignments of error challenging his conviction for carrying a concealed weapon under R.C. 2923.12(A)(2), we affirm that conviction. *See* App.R. 16(A); *see also State v. Perez*, 1st Dist. Hamilton Nos. C-040363, C-040364 and C-040365, 2005-Ohio-1326, ¶ 21-23.

Judgment accordingly.

**ZAYAS, P.J.,** concurs.
**BERGERON, J.,** concurs in part and dissents in part.

**BERGERON, J.,** concurring in part and dissenting in part.

{¶82} I agree with aspects of the majority's opinion and with its affirmance of Mr. Jones's conviction for carrying a concealed weapon, but I respectfully disagree with the conclusion that Mr. Jones's conviction for aggravated murder was not supported by sufficient evidence demonstrating prior calculation and design and with its decision to remand for a new trial.

A.

{¶83} I'll start with the prior calculation and design issue. While this is certainly a close case, Mr. Jones's appellate brief relies heavily on the defense's version of the facts and contradicting evidence to support his claim that his conviction for aggravated murder lacked sufficient evidence. That is not, however, the lens through which we should view this question. A challenge to the sufficiency of the evidence asks whether "the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d

541 (1997). As a reviewing court, we must determine whether "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Bedell*, 2018-Ohio-721, 107 N.E.3d 160, ¶ 11 (1st Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Thus, sufficiency of the evidence is a "test of adequacy." *Thompkins* at 386. Most importantly, a review of the sufficiency of the evidence "[does] not consider its credibility or effect in inducing belief." *State v. Richardson,* 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins* at 386-387. Proceeding under this framework, I would find that the state met its burden here.

{¶84} We are guided in this endeavor by the Ohio Supreme Court's three-part test described in *State v. Taylor,* 78 Ohio St.3d 15, 676 N.E.2d 82 (1997). Heavily fact-dependent, this inquiry asks us to consider: (1) whether the accused and victim knew each other, and the nature of the relationship; (2) whether the accused gave thought or preparation to choosing the murder weapon or murder site; and (3) whether the act was drawn out or an almost instantaneous eruption of events. *Id.* at 19 (describing *State v. Jenkins*, 48 Ohio App.2d 99, 355 N.E.2d 825 (8th Dist.1976)). While this three-part test (like many such inquiries) leaves something to be desired, as I filter the facts at hand through the *Taylor* criteria, I walk away convinced that the state satisfied its burden. Although Mr. Jones frequently carried a gun, the fact that he exited the vehicle, gun in hand, could have allowed the jury to reasonably infer that he carried the gun with intent to use it. *See Taylor* at 22 ("The jury could reasonably have inferred that appellant may have carried the gun with an intention to use it. The jury could have drawn that inference from all the circumstances surrounding the shooting * * *."). Indeed, there is a marked difference between

33

carrying a gun holstered on one's person versus walking around with that same gun out, in hand, presumably at the ready.

{¶85} Evidence presented at trial further indicated that Mr. Neri was standing in front of the house when Mr. Jones arrived. Mr. Jones then parked directly in front of the house and left his car running with the door open. Moreover, testimony showed that Mr. Jones exited his car and deliberately took steps towards Mr. Neri, raised the gun which he was already holding and fired, paused in between shots to speak to Mr. Neri, and even fired shots as Mr. Neri was fleeing. Similar factors supported the jury's finding of prior calculation and design in *Taylor,* despite the fact that the events there unfolded very quickly. *Id.* at 21-22 (appellant's decision to strategically position himself and friends before the shooting and continue shooting once the victim was on the ground provided sufficient evidence of prior calculation and design, despite short duration of the encounter).

{¶86} And we certainly cannot divorce the background context from what happened in those two minutes or so when the shooting occurred. We had a long-simmering feud between Mr. Jones and Mr. Neri that seemed to be escalating. *See id.* at 21 (emphasizing the "strained relationship" between the accused and the victim). Evidence presented at trial established that the two men were constantly threatening and planning fights, and that the two desired a fight for months leading up to the murder. Indeed, Mr. Jones was trying to arrange a fight with Mr. Neri *that very day*. Mr. Jones protests, insisting that he intended to ensure that Mr. Neri was at another location at the time he arrived to pick up his son, but the jury certainly could have seen that differently. The location for their planned brawl sat just a stone's throw from the house, rendering it likely that Mr. Neri would be nearby in any event.

{¶87} We also know that Mr. Jones was apprehensive about actually fighting Mr. Neri based on the disparity in their sizes. It's also probably fair to conclude that he knew that he could not run from Mr. Neri forever. Ms. Prather's conduct suggests that she knew the fight needed to happen, and just wanted it over with. But when that day of reckoning arrived, Mr. Jones brought a gun rather than just his fists.

{¶88} Here the jury could have reasonably found, based on the evidence presented, that Mr. Jones formulated a plan to kill Mr. Neri that involved ascertaining his whereabouts under the guise of planning the fight. Then, upon arriving at the house and seeing Mr. Neri out front, Mr. Jones strategically parked (to ensure a quick getaway) and jumped out of the car, gun in hand, approaching Mr. Neri and firing upon him even as he fled.

{¶89} Is Mr. Jones's alternative explanation for all of these events plausible and is some of this evidence disputed? Sure. But we must construe the evidence in a light most favorable to the state, consistent with the jury's verdict and in line with *Taylor*.

{¶90} In sum, the finding of prior calculation and design is "justified '[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill.' " *State v. Phelps*, 1st Dist. Hamilton No. C-100096, 2011-Ohio-3144, ¶ 26, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph three of the syllabus (more than "instantaneous deliberation" when factors demonstrated a "scheme designed to implement the calculated decision to kill."). Our duty here is not to evaluate who we should believe more, but rather, if believing all the evidence that the prosecution presented, could a rational jury find

all the elements proven beyond a reasonable doubt. For all the foregoing reasons, I would find that the prosecution met that burden based on the record at hand.

B.

{¶91} When I consider the evidentiary issues that the majority discusses, I agree that: (1) the trial court erred in admitting the photo of the guns and ammunition in Mr. Jones's bedroom; (2) the trial court erred in precluding Mr. Jones from testifying about the threats from Mr. Neri; and (3) the trial court inconsistently handled admissibility of the social media posts.

{¶92} But I part company with the majority on the harmless error aspect of its analysis, and here's why. Instrumental to the conclusion that the court deprived Mr. Jones of his ability to present a defense was the court's barring him from testifying about the threats from Mr. Neri. But when we look at the transcript, defense counsel proffered that Mr. Jones's father and aunt would testify that Mr. Neri came searching for Mr. Jones armed with a weapon, points they later conveyed to Mr. Jones.

{¶93} The trial court handled this by inquiring whether those witnesses (who encountered the threats first-hand) would testify, asking "[i]s his father testifying?" Counsel responded, "Yes, ma'am," prompting the court to conclude, "[t]hen he can say it." After further back-and-forth, the trial court reiterated that the father and aunt "can testify to what" happened.

{¶94} Was this how this issue should have been resolved? No. But did counsel have a path—one he professed he was going to go down—to get evidence of these threats into the record? Yes.

{¶95} For reasons beyond the confines of the record, counsel did not pursue that path and did not summon the father and aunt to testify. Maybe that was a wise

36

strategic decision, maybe not. But I find myself unable to conclude that the court unduly deprived the defendant of his right to present a defense on this record.

{¶96} Similarly, with respect to the social media posts, I share the majority's difficulty in discerning the distinction between the admitted and excluded posts, but ultimately I conclude that the excluded posts would have, at best, provided cumulative evidence of the admitted ones. In other words, nothing so dramatic and impactful occurred in them that the jury did not already have before it in the admissible tweets.

{¶97} However, I am troubled by the timing issue regarding the May post (given that the state seized upon that in closing) and the gun photograph. *See State v. Lavender,* 1st Dist. Hamilton No. C-180003, 2019-Ohio-5352, ¶ 151-154 (Bergeron, J., dissenting). Nevertheless, I view the harmless error conclusion differently than the majority based on my conclusion about prior calculation and design and the threats. After thoroughly reviewing the record, I cannot say that these two evidentiary issues justify a new trial based on how I would resolve the other aspects of this appeal.

{¶98} Therefore, I respectfully concur in part and dissent in part.

Please note:

The court has recorded its own entry on the date of the release of this opinion.