[Cite as *State v. English*, 2020-Ohio-4682.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180697 |
| | | TRIAL NO. B-1804296 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| KAHLIA ENGLISH, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  September 30, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael K. Allen & Associates*, *Michael K. Allen* and *Bryan R. Perkins*, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1}     Kahlia English was convicted of murder and having weapons while under a disability for fatally shooting Elijah Wheeler ("Elijah"), after Elijah became the target of English's anger toward Elijah's uncle, Eric Wheeler ("Eric"). English now appeals, arguing his convictions should be reversed due to the lack of credible evidence, the admission and use of propensity evidence, the introduction of unauthenticated Facebook evidence, the prosecutor's misconduct, the jury's observation of him in handcuffs, the denial of his right to the effective assistance of counsel, the trial court's mishandling of the jury's verdicts, a Batson violation during voir dire, and the cumulative effect of error at trial. For the reasons that follow, we affirm.

## Background Facts and Procedure

{¶2}     English was tried to a jury on charges related to the July 27, 2018, shooting death of Elijah in the Cumminsville area of Cincinnati. Elijah was shot five times and died shortly thereafter in front of a church on Weber Street at Borden Street. The church was where members of the Wheeler and English families often gathered with friends. The families are related by the marriage of Eric's aunt to English's uncle. At the time of the shooting, there was a group of men gathered in front of the church gambling and smoking marijuana. To prove that English murdered Elijah, the state relied primarily on the testimony of Eric and two eyewitnesses, Brandon Crawford—Eric's first cousin but also a relative of English—and Angela Hardin—a distant relative on English's side of the family.

{¶3}     Eric testified that he and English, known as "Kaleek," shared a close, "brother-like" bond, evinced by a hand tattoo on each of the other's birthdate. That close bond ended and became hostile in 2016 or 2017, when English was injured in a

2

shooting. Eric would not elaborate about the demise of the close relationship. He implied it involved his refusal to become involved when English was shot, explaining that he likes to "stay in [his] own lane." He further indicated that English, who he knew to sometimes carry a firearm, "just be outgrowing people."

{¶4} According to Eric, on the day of the shooting, he and English were in front of the church in the late afternoon playing dice with others, including Elijah and Crawford. At one point, Eric became so angry at English that he grabbed the dice off the ground and threw them before leaving. Eric further testified that he received a call from Crawford about 15 minutes later telling him that Elijah had been shot.

{¶5} Crawford testified that he had known English as "Kaleek" for many years and considered him a "friend." Like Eric, Crawford said that on the day of the shooting he was "chilling" in front of the church with English and others. Around 5:30 p.m., Eric became upset during a dice game, "threw the dice," and then left. Upon Eric's dramatic departure, English also departed.

{¶6} According to Crawford, English returned to the church a short time later in a car. After exiting from the car, English "called everybody together" to the "church steps." As Crawford walked toward the steps, he heard English give "a little speech" to Elijah and the seven or so others who had assembled.

{¶7} Crawford recalled that during the speech English reminded the crowd "that he had been shot before." English then focused on Eric's disrespectful actions. English said that he "loved everybody" and did not know why Eric had thrown the dice and he wished "it wasn't like that." English then taunted: "if anybody got a problem with me," "[y]ou-all going to have to kill me." After a silent period, Elijah spoke up and had words with English. Crawford could not remember details except

3

that the argument involved something in the past and an accusation of a "set up."
When Elijah defended his family, Crawford saw English pull out a gun and fire at
Elijah while threatening "to kill" everyone around him. He described English's gun
as "kind of big," and an "automatic," not like a revolver.

{¶8} Crawford saw no other guns before he ran away from the scene while
English was shooting. He did not look back, but returned minutes later to find Elijah
lying on the sidewalk in front of the church steps taking his last breaths. English was
not there and the police soon responded.

{¶9} Crawford further testified that he called Eric and told him what he
had seen, and gave a statement to the police identifying "Kaleek" as the shooter.

{¶10} Hardin testified she was returning to her home on Weber Street in her
truck with the windows down just before the shooting. She heard "a lot of hollering"
from a "bunch of boys" in front of the church as she approached the intersection of
Weber and Borden Streets. As she turned the corner to Weber Street, she heard a
"gun shot." When she looked out her side window opening, she saw a black male
with black hair "standing in the crowd" "on the sidewalk," in front of the church with
an "arm out shooting the gun." Then the crowd "r[an]" in different directions while
"screaming." As she continued to her home on the dead-end street, she heard "four
or five shots" but did not look back at the crowd. She described the gun as "gray or
silver," and further testified that she had not seen any other weapons, but had seen a
black, mid-sized sedan on the street.

{¶11} When asked by the prosecutor if the body type of the shooter matched
that of English, Hardin said that she did not know English by sight. She was
subsequently impeached on the former statement by the detective investigating the

4

murder, who testified that Hardin had told the police that the shooter's body type matched that of English.

{¶12} The evidence collected by the police, who had arrived at the scene about eight minutes after the shooting, corroborated Crawford's and Hardin's eyewitness accounts. Although the police did not recover a weapon, the ballistic evidence and location of the six "Hornady .40 caliber S&W" spent casings suggested there was just one shooter, who had shot a larger-sized, semiautomatic handgun from the sidewalk.

{¶13} Additionally, a surveillance video captured from a property down the street from the church showed a black sedan traveling up Borden Street toward the scene shortly before the shooting. Subsequently, three males are seen running away from scene, followed less than a minute later by the same sedan.

{¶14} The state's evidence also showed that English was arrested several days after the shooting upon his arrival at his final appointment with his probation or parole officer in Northern Kentucky. English was driving a black Nissan Altima sedan. The unique features of that black Nissan appeared to match those of the black sedan in the surveillance video. The Nissan was registered to English's brother Dante. The brothers generally did not look alike and Dante was bald, unlike English and the shooter.

{¶15} Police officers searching the Nissan found cash amounting to $6,100 in the glove box, and bags of clothes and English's personal items in the main compartment, including English's driver's license and a motel receipt from July 29, 2020. Officers who searched English's apartment found it deserted. Further, English's cellphone records showed pings off of cell towers in the Cumminsville area just before and after the shooting.

{¶16}    When arrested, English was notified of his rights before speaking with detectives.  He provided several contradictory explanations as to how he learned that Elijah, who "was like a cousin," had died.  The first was particularly incriminating.  He told the detectives he found out through Facebook, but when asked about his Facebook page, he said he did not have one.  The trial evidence showed that he did.  Ebony Wheeler ("Ebony"), Elijah's aunt and Eric's twin sister, authenticated at trial postings from the Facebook page that she had created for English in 2011.  This evidence showed that instead of offering condolences to the Wheeler family after the shooting, English posted a "no snitching emoji."  That July 29, 2018 posting was printed out and admitted as an exhibit at trial, along with other postings Ebony had seen on English's Facebook page.  Ebony additionally testified that she knew English to carry a gun, and she described him as a "shystie" and "dangerous," even though she admitted that she "loved" him like a "brother."

{¶17}    Eloise Wheeler ("Eloise"), who was Elijah's grandmother and Eric and Ebony's mother, went to the scene immediately after she learned about the shooting from Eric.  She arrived at the scene several minutes before the police.

{¶18}    Eloise testified about what she had seen after the shooting and had shared with the police, and gave background information about the relationship between English and her family.  She explained that English and Eric had been very close, a relationship she did not condone because she thought English was "sly, slick, and wicked" and "sold drugs."  She confirmed the more recent hostility between the two, and said she had seen English and Eric "getting into it" several weeks before the shooting at a Fourth of July gathering.   Despite her dislike of English, she remained Facebook friends with him.

{¶19} English did not present any witnesses at trial. He did, however, introduce several exhibits, including an image purportedly from his Facebook page depicting him holding what looked like an assault-rifle style "toy" gun, marked by an orange tip. Defense counsel argued that that toy gun was the same gun that was partially depicted in a grainy Facebook post authenticated by Ebony. Other defense exhibits included a photograph depicting Elijah and friends holding what looked like real guns, and a copy of a 2010 murder indictment issued against one of Eloise's sons for a shooting at the same church corner.

{¶20} These defense exhibits were used during cross-examination to bolster the theme of the defense, introduced during opening statement, that the church corner was a frequent gathering place for "a gang of people known to carry guns," "any one of whom could have shot Elijah," and that the jury would never know which one had shot Elijah because of an inadequate police investigation and a Wheeler family cover up.

{¶21} The final defense exhibit was a photograph of English with Eloise and Eric, smiling together at a birthday gathering. Defense counsel argued that image showed the Wheeler family witnesses were untruthful when they said that English was "evil" and they did not want to be around him.

{¶22} In closing argument, the state asserted that it had established all the elements of the offenses, citing the abundant evidence of guilt. The state contended that it had additionally established English's motive for killing Elijah: it was an explosion of English's building anger caused by Elijah's uncle's disrespect and lack of support.

{¶23} At the conclusion of the trial, the jury found English guilty on two counts of murder with firearm specifications and a single count of having weapons

while under a disability. The disability arose from English's stipulated-to prior conviction for a felony drug offense.

{¶24} Before sentencing, English moved for a new trial on several grounds. These included alleged irregularities involving the receipt and sharing of the jury's verdicts and the jury's observation of English in handcuffs. The trial court overruled the motion and, after merging the murder offenses, sentenced English to an aggregate prison term of 21 years to life. English now appeals, raising ten assignments of error. For ease of discussion, we address the assignments out of order.

## Sufficiency and Weight of the Evidence

{¶25} We first address English's eighth and ninth assignments of error, in which he argues his convictions are not supported by sufficient evidence and are against the weight of the evidence.

{¶26} English argues the state did not prove he was the shooter beyond a reasonable doubt because the state did not present forensic-type evidence connecting him to the shooting, such as DNA samples, or evidence that the murder weapon was found on him at the time of his arrest. Further, he claims there was evidence that pointed to other suspects. Finally, he contends that the only witness to identify him as the shooter—Crawford—was not credible.

{¶27} English's challenge to the sufficiency of the evidence is meritless. As the Ohio Supreme Court recently reiterated

> An appellate court's function when reviewing the sufficiency of the
> evidence to support a criminal conviction is to examine the evidence
> admitted at trial to determine whether such evidence, if believed,
> would convince the average mind of the defendant's guilt beyond a

8

reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Internal citations omitted.) *State v. McFarland*, Slip Opinion No. 2020-Ohio-3343, ¶ 24.

{¶28} The *McFarland* court further emphasized the trier of fact's responsibility " '[to] fairly [] resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.*, citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶29} To satisfy its burden in this case, the state was not required to present DNA evidence connecting English to the crime or to recover the murder weapon from him. English argues Crawford's testimony could not be relied upon because he suffered from the mental illness paranoid schizophrenia. But the record demonstrates that Crawford was a competent witness to the shooting and a competent witness on the stand at trial, having taken medication to control his paranoid schizophrenia in both instances. The jury was able to view Crawford's demeanor at trial and immediately after the shooting, when he first identified "Kaleek" as the shooter upon questioning by the officer responding to the scene, because that officer's body camera footage was admitted into evidence.

{¶30} English's other arguments attacking Crawford's credibility are similarly untenable. He claims that the body camera footage shows Crawford agreeing with the officer that "Kaleek's" last name was "Walker." But this is not accurate. Crawford told the officer, "I don't know his last name." English's contention that Crawford conspired with Eloise and the Wheeler family in the

minutes before the police arrived to concoct a story to frame him and alter the crime scene is similarly unavailing based on the evidence. The body camera footage upon the officer's arrival shows Eloise extremely distraught and angry at the senseless killing of her grandson over a "dice game." She was also upset at the failure of witnesses to cooperate with the police, shouting "there's a bunch of mother*******  over there that can tell you what you need to know. If they don't, I ain't leaving." Thus, English's claim of a cover up is incredible.

{¶31} Crawford's testimony that English was the shooter was unwavering, even when subjected to vigorous cross-examination. Moreover, his testimony was corroborated by Hardin's testimony and the physical evidence.

{¶32} English further argues that the state's theory was undermined by evidence that the crime involved a drive-by shooting from a blue car. He cites a broadcast the responding officer received from the dispatcher relaying a report of a "blue vehicle" and "shots fired out of that." That report, however, does not undermine the state's evidence.

{¶33} First, the source of the cited 911 report is unknown, and the dispatcher later relayed of a report of a "black" car at the scene, which Hardin and the video surveillance confirmed. Notably, blue, like black, is a dark color. English suggests that a blue car was at the scene when the police arrived and its occupants were allowed to leave, but that car was "greyish" and contained a family with small children.

{¶34} Second, two undisputed facts rendered incredible the claim that the crime was a drive-by type shooting, and not a shooting that started on the sidewalk in front of the church on Weber Street. First, Elijah was the only victim in the crowd who was shot, sustaining five well-placed wounds. And, second, as the crime scene

investigator explained, a spent casing found atop the landing of the nine steps in front of the church could not have been fired from a vehicle due to the height of the landing.

{¶35}   Further, the report of "shots fired out of" a dark-colored car was not inconsistent with Crawford's testimony that he saw English shoot from the sidewalk, and Hardin's corroborating testimony that she saw the shooter in the crowd on the sidewalk, because neither saw the shooter leave and fire his last shoots.  They both escaped the scene by travelling down Weber Street, a dead-end street, and away from Borden Street.  They did not see English leave the scene because, as the surveillance video confirmed, English drove away on Borden Street.  The other five spent casings were found in Weber Street, one just next to the sidewalk in front of the church and the others progressively closer to the middle of the street.

{¶36}   English's challenge to the sufficiency of the evidence further collapses because his actions after the shooting were indicative of guilt.  This includes the indisputable evidence of flight, English's use of the no snitching emoji on his Facebook page, his conflicting statements during his police interview explaining how he learned of the shooting, and his failure to reach out to the Wheeler family after the shooting.

{¶37}   When the evidence is viewed in the light most favorable to the state, we conclude that any rational trier of fact could have found proof of guilt beyond a reasonable doubt. Thus, we reject English's sufficiency-of-the-evidence-based challenge to his convictions.

{¶38}   Our review of a claim that a jury verdict is against the weight of the evidence involves a different inquiry.  *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 71.  But this is not an " 'exceptional case in which the

11

evidence weighs heavily against the conviction.' " *See State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). We find that the jury neither lost its way nor created a miscarriage of justice in convicting English of murder or the separate weapons offense. The state rebutted English's theories of innocence and presented overwhelming evidence of guilt. Accordingly, we overrule the eighth and ninth assignments of error.

## Propensity Evidence

{¶39} In his third assignment of error, English argues that the trial court erred when it allowed the jury to consider propensity-type evidence weighing negatively on his character. This includes evidence that he was on "probation" or "parole," was "wicked," "dangerous," "sold drugs," and carried and sought guns. In addition to this testimony, English directs us to closing argument, when the prosecutor remarked:

> [N]ow, as I said before, we don't have to prove motive, but I think there was a motivation to kill Elijah Wheeler in this case. Eric Wheeler said he had outgrown Kaleek. We had ample testimony describing what type of person that Kaleek was in that community; that he was wicked, that he was violent, that he did bad things. And Eric Wheeler told you he was outgrowing him, he wanted to get away from that, and that Kaleek did not like it, and that's why he was saying stuff and getting Eric upset.

{¶40} Later, in the rebuttal portion of closing argument, the prosecutor argued:

12

What type of person is Kahlia English? He's got a terrible temper, he carries guns, he's not afraid to use. He shoots and kills someone, at close range.

**{¶41}** English concludes that because these attacks on his character were so pervasive and inflammatory, and were used by the prosecutor as proof of his guilt, a purpose specifically prohibited under Evid.R. 404(A) and (B), the aggregate effect of the evidentiary errors was a denial of his due-process right to a fair trial.

**{¶42}** Ohio's rules of evidence contain exceptions to the principle that all relevant evidence is admissible. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 12 ("*Morris I*"). Generally, the state is forbidden from initially introducing evidence of the accused's bad character until the accused presents evidence of his good character for the purpose of proving conformity with that good character. Evid.R. 404(A). "Although character is not irrelevant, the danger of prejudice outweighs the probative value of such evidence." *State v. Lytle*, 48 Ohio St.2d 391, 401-402, 358 N.E.2d 623 (1976), *vacated on other grounds*, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978).

**{¶43}** Evid.R. 404(B), along with R.C. 2945.59, prohibits the admission of other-acts evidence to prove a character trait for the purpose of showing (1) conduct in conformity with that trait or (2) the accused's general propensity to commit crimes. *State v. Hartman*, Slip Opinion No. 2020-Ohio-4440, ¶ 21-22; *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 35.

**{¶44}** A nonexclusive list set forth in the rule includes the use of probative other-acts evidence for a limited purpose to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B); R.C. 2945.59. That nonpropensity purpose must pertain to a " 'material'

13

issue that is actually in dispute." *Hartman* at ¶ 27, quoting *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.E.2d 771 (1988). Further, there must be " 'substantial proof' " that the defendant committed the alleged other act at issue. *Hartman* at ¶ 28, quoting *State v. Carter*, 26 Ohio St.2d 79, 83, 269 N.E.2d 115 (1971). Finally, the evidence must "connect[] to a proper purpose without relying on any intermediate improper-character inferences." *Hartman* at ¶ 23.

{¶45} Even so, the evidence is not admissible if its "probative value" for that nonpropensity purpose "is substantially outweighed by the danger of unfair prejudice." Evid.R. 403; *Hartman* at ¶ 29, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. ["W]hen such evidence is only slightly probative of a nonpropensity theory but has a high likelihood of unfairly prejudicing the defendant or confusing or misleading the jury, the evidence must be excluded." *Hartman* at ¶ 33.

{¶46} The trial court's provision of a "tailored" instruction to the jury on the limited purpose of other-acts evidence can reduce the danger of unfair prejudice. *See Hartman* at ¶ 34, 70; *Williams* at ¶ 24. These rules can guard against a conviction based upon propensity evidence, which may violate the due-process right to a fair trial.

{¶47} The questions ordinarily presented on appeal with respect to potential propensity-type evidence is whether the evidence was admissible because "it [wa]s probative of a separate, nonpropensity-based issue," an issue of law, and if so, whether the trial court abused its discretion by admitting it according to the balancing test in Evid.R. 403. *See Hartman* at ¶ 22, 29-30. If we find error in the admission of the evidence, we must then determine if the state has shown the error

14

did not prejudice the defendant. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23 ("*Morris II*").

{¶48} In determining whether to grant a new trial as a result of the erroneous admission of evidence under Evid.R. 404(B), an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record. *Id.* at ¶ 33. A "strong case" may require reversal if the evidentiary error is combined with the prosecutor's emphasis on the improperly admitted evidence, resulting in "blatant prejudice." *Id.* at ¶ 31-32. However, if, after the tainted evidence is removed, the remaining evidence is overwhelming, the erroneous admission of character and other-acts evidence may be deemed harmless beyond a reasonable doubt. *See id.* at ¶ 32.

{¶49} Our review in this case is hampered because, as the state points out, English did not object to this evidence on the basis now raised. Thus, English forfeited all but plain error. *See, e.g.*, Evid.R. 103(A)(1) and (D); *Thomas,* 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, at ¶ 32.

{¶50} Under the plain-error doctrine, the defendant bears the burden of demonstrating that plain error affected his substantial rights. *See* Crim.R. 52(B); *Thomas* at ¶ 32. He is required to show a "reasonable probability" that the error affected the outcome of the trial, *id.* at ¶ 33; in other words, the type of error so serious it deprived him of a fair trial, one with a result that is reliable. *See Harrington v. Richter*, 562 U.S. 86, 104, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (explaining the reasonable-probability standard.). Even if the defendant meets his burden, this court has discretion to ignore the error, and should do so except "to

prevent a manifest miscarriage of justice." (Internal citations omitted.)  *Thomas* at ¶ 34.

{¶51}    The alleged evidentiary errors occurred during the testimony of Detectives Sieving and Gehring, Eloise, and Ebony.  English cites several portions of Ebony's testimony, including testimony concerning other weapons evidence.

{¶52}    The first incident involved firearm-related postings Ebony had seen on English's Facebook page that were printed out and admitted as exhibits.  One posting, state's exhibit 27 ("Exhibit 27"), showed two loaded firearm magazines and was captioned "60bangbang." The other, state's exhibit 28 ("Exhibit 28"), was a blurry and partial image of an assault-rifle type gun. Defense counsel objected to the admission of these exhibits on "relevancy" grounds, citing the age of the postings. The trial court overruled the objection.

{¶53}    Later, during cross-examination, defense counsel asked Ebony if her relationship with English had soured a year before the shooting, and she agreed. But she then explained that English was a "shystie" and "dangerous."  Defense counsel did not object or move to strike the testimony.  Subsequently, when defense counsel was asking Ebony to concede that the blurry Facebook image in Exhibit 28 was of a toy gun, Ebony gave a variety of unresponsive answers, all indicating that she had seen English with many guns.  Later, Ebony replied to defense counsel's questioning by saying that English had brought guns to her mother's house and had guns in his sister's basement.  Defense counsel twice objected, and the court in response instructed Ebony to simply answer the questions. Defense counsel did not move to strike Ebony's unresponsive testimony.

{¶54}    Finally, English cites Ebony's unobjected-to testimony on redirect that she had seen English with "revolvers and pistols, and all kinds of guns" and that

he had "been trying to bribe" her into getting "a gun and bullets" for him "since she turned 18."

{¶55} Although English objected at trial to Exhibits 27 and 28 on general relevancy grounds, the test of Evid.R. 401, he does not articulate any relevancy-based challenge now. Instead, he argues the exhibits involve "inflammatory" other-acts evidence. Inflammatory other-acts evidence should be excluded under Evid.R. 403 because the probative value of the evidence for a nonpropensity purpose is substantially outweighed by the danger of unfair prejudice. *See Hartman* at ¶ 29; *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20 and 24.

{¶56} The Ohio Supreme Court recently warned of error in the admission of "other weapons evidence." *Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 35. At a minimum, "[t]he evidence must be excluded when it leads only to inferences about the defendant's character." *State v. Jones*, 1st Dist. Hamilton No. C-170647, 2020-Ohio-281, ¶ 32, citing *Thomas* at ¶ 41; *State v. Carusone*, 1st Dist. Hamilton No. C-010681, 2003-Ohio-1018; *State v. Crosby*, 186 Ohio App.3d 453, 2010-Ohio-1584, 928 N.E.2d 795, ¶ 16 (8th Dist.).

{¶57} The state argues that the trial court did not err in admitting Exhibits 27 and 28. Although the state did not expressly articulate the nonpropensity purpose for offering the exhibits in the trial court, the state's theory of the case suggests the exhibits were offered to confirm Eric's reason for disliking English, which helped to explain English's anger and prove English's motive for shooting Elijah. On appeal, the state articulates that the exhibits were relevant to English's "knowledge of and possession of guns," at issue because an eyewitness testified to seeing English shoot Elijah with a handgun and English pleaded not guilty to the charges. The state does not argue that the exhibits contained the murder weapon, and it does not address

17

whether the probative value of these exhibits to show the nonpropensity purpose was substantially outweighed by the danger of unfair prejudice.

{¶58} We do not address the legal inquiry required of Evid.R. 404(B)—whether the evidence was admissible for a nonpropensity purpose—because English does not present that argument on appeal. But we agree with English that the evidence should not have been admitted under Evid.R. 403(A). Any probative value of these exhibits for a nonpropensity purpose was substantially outweighed by the danger of unfair prejudice. The state argued that the murder weapon in this case was a semi-automatic pistol, and the undated image of an assault-style rifle in Exhibit 28 does not link the defendant to that handgun.

{¶59} Even if Exhibit 28 was probative of the nonpropensity purpose of proving motive, it should not have been admitted because any probative value of the undated image was substantially outweighed by the danger of unfair prejudice—namely, the inference that English had a violent, criminal disposition and had acted in conformity with that on the day of the shooting. This " 'demonstration of a pattern and the inference that [the defendant] acted in conformity with the pattern is precisely why other-acts evidence is generally inadmissible.' " *State v. Cobia*, 1st Dist. Hamilton No. C-140058, 2015-Ohio-331, ¶ 20, quoting *State v. Kelly*, 1st Dist. Hamilton No. C-140112, 2014-Ohio-5565, ¶ 8.

{¶60} Similarly, there was underwhelming evidence linking Exhibit 27, the March 2016 posting of the two extended magazines, captioned "60bangbang," to the murder weapon. While Crawford testified, consistent with the ballistic evidence, that the murder weapon was a "bigger," automatic-type handgun, and the firearms examiner explained that a handgun can be equipped with a magazine that extends beyond the "grip," the examiner never stated that those magazines would have fit

18

the predicted murder weapon. In light of the violent caption and the age of the posting, we conclude that the probative value was substantially outweighed by the danger of unfair prejudice.

{¶61} Ultimately, Exhibits 27 and 28 should have been excluded because any value they had for establishing a nonpropensity purpose was substantially outweighed by the risk of unfair prejudice. *See* Evid.R. 403(A).

{¶62} Similarly, Ebony's testimony concerning English's desire to bribe her to obtain guns, his stockpiling of guns, and her other general testimony reflecting negatively on his character should not have been admitted. Notably, English did not place his character at issue in this case. *See* Evid.R. 404(A). But the erroneous admission of Exhibits 27 and 28 and Ebony's other-acts and negative character testimony did not rise to the level of plain error that affected English's substantial rights, because it did not affect the outcome of the trial.

{¶63} The prosecutor's remarks in closing argument directed to English's character increased the risk of unfair prejudice, as did the lack of an instruction on any legitimate purpose for the evidence. But defense counsel mitigated the prejudice by rebutting the claim that the postings on English's Facebook page involved real weapons. Further, the jury was desensitized to the negative proclivities of gun ownership. Defense counsel began this process in opening statement by remarking that: "The fact of the matter is that this place, this church, is a frequent gathering place for a gang of people down there who are known to carry guns, who are known to be involved in drug trafficking. It's a very violent group with big guns that are there frequently," thereby desensitizing the jurors to the testimony they were about to hear.

{¶64} Additionally, the jury was aware that English carried a gun through Eric's testimony, and that testimony is not challenged on appeal. Finally, and most importantly, when Exhibits 27 and 28 and all of Ebony's challenged testimony that negatively reflected on English's character is removed, the remaining evidence of guilt is overwhelming. The case boiled down to whether Crawford was a believable witness when he repeatedly named English as the shooter. We conclude that all of the challenged weapon and bad-character evidence admitting during Ebony's testimony could not have appreciably impacted that determination, because of the strength of the evidence corroborating Crawford's testimony—the physical evidence, Hardin's testimony, and English's actions after the shooting, including indisputable evidence of flight.

{¶65} The court's admission of evidence showing English was on parole or probation at the time of his arrest was not error, much less plain error. The jury learned during the testimony of the detectives assigned to the case that English was arrested on a sealed warrant after appearing for his final appointment with his probation or parole officer in Newport, Kentucky. The Fugitive Apprehension Unit had learned of this appointment after making some inquiries, and an effort was made to keep the news of the planned arrest from English and the public. The court sustained objections to Detective Sieving's testimony based on "hearsay" and "speculation," but defense counsel did not move to strike the testimony, object on relevancy or propensity grounds, or request a limiting instruction. Defense counsel did not object at all to Detective Gehring's testimony.

{¶66} Although English now claims the information was "irrelevant" and "prejudicial," we disagree. The detectives' testimony was offered to rebut defense counsel's claim in opening statement that the evidence would show English had

turned himself in to authorities and to explain the evidence of flight. And the evidence was not unduly prejudicial, because the jury was aware that English had a prior conviction that prevented him from having weapons and because the challenged evidence could be viewed as showing English's success on postconviction supervision. Further, defense counsel used this evidence to support a claim of innocence, raising the point, during cross-examination and in closing argument, that individuals "on the run" do not "check in" with their "parole" or "probation officer."

{¶67} Finally, we determine that the trial court's admission of Eloise's challenged testimony was not plain error. Eloise testified that she never liked English because he was "sly, slick, and wicked," he was known for doing things such as "selling [] drugs," and Eric was going to school and she did not want Eric "to hang with him" and "ruin" his progress. Defense counsel did not object to this testimony. The state argues that this testimony was offered to give context to the inter-family dynamics that July. But this part of Eloise's testimony explained the relationship when Eric and English were younger.

{¶68} This evidence involves negative character and other-acts evidence. English did not put his character at issue, and the probative value of this evidence for a nonpropensity purpose, if any, was substantially outweighed by the danger of unfair prejudice. The impact, however, was minimized to some extent. Defense counsel used this testimony, along with a photograph of Eloise and Eric with English appearing happily together at a dinner party, in an attempt to impeach Eloise's credibility. Although the prosecutor in closing argument encouraged the jury to use this character and other-acts evidence as evidence of guilt, when this evidence is removed, the outcome of the trial would be the same because the remaining evidence is overwhelming. Thus, the admission of this testimony was not plain error.

21

{¶69} Finally, we conclude that the cumulative effect of the trial court's evidentiary errors did not affect English's substantial rights. Ultimately, the trial court's erroneous admission of other-acts and character evidence did not affect the outcome of the trial nor could it have denied English his due-process right to a fair trial. Accordingly, we overrule the third assignment of error.

## Prosecutorial Misconduct

{¶70} In his fourth assignment of error, English raises misconduct by the prosecutor as a ground for overturning his conviction. The test for prosecutorial misconduct is whether the prosecutor's actions and remarks were improper, and, if so, whether they prejudicially affected the defendant's substantial rights. *See State v. v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 45.

{¶71} The prosecutor may "strike hard blows," but must refrain from "strik[ing] foul ones." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The core of our analysis, however, is "is the fairness of the trial, not the culpability of the prosecutor." *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 110, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶72} We first reject English's claim that the prosecutor's elicitation and improper use of character and other-acts evidence, referenced in the previous assignment of error, was misconduct that resulted in an unfair trial. A prosecutor may not elicit improper character and other-acts evidence and then use the evidence in closing argument to portray the defendant as a violent, gun-toting individual who had acted in conformity with his bad character in carrying out the murderous act identified in the indictment. *See Carusone*, 1st Dist. Hamilton No. C-010681, 2003-Ohio-1018, at ¶ 41. But we have already determined that error in the admission of

character and other-acts evidence did not affect English's substantial rights. English did not object to the prosecutor's remarks in closing argument emphasizing the propensity evidence. While those remarks were improper, the attack on English's character did not pervade the closing argument and rebuttal. Instead, they were overshadowed by proper argument directing the jury to the overwhelming evidence of guilt. Thus, we are persuaded that the verdicts would have been no different in the absence of the challenged conduct.

{¶73} English also contends the prosecutor elicited irrelevant and inflammatory evidence from Detective Gehring in an attempt to show that the state's witnesses and potential witnesses were in fear of English. Although the prosecutor should refrain from eliciting irrelevant and inflammatory evidence, we disagree with English's characterization of this evidence.

{¶74} The prosecutor's purpose for eliciting testimony from the detective concerning the reactions to subpoenas was to rebut the defense's theories that the state did an incomplete job of interviewing witnesses and failed to bring in eyewitnesses to testify, and to explain the discomfort displayed by those who did testify. As Eric explained, he did not want to testify because those who do "get shot"—"[i]t['s] just how it do." In the one instance that English objected to this type of questioning of the detective on relevancy grounds, the trial court found his testimony relevant, and that evidentiary ruling is not assigned as error on appeal.

{¶75} English argues that the jury's concern over their safety after the trial demonstrates the prosecutor's conduct denied him a fair trial. Admittedly, the jurors were concerned about their safety after the trial. This is not surprising, however, concerning their exposure to violent crime occurring in broad daylight in their community. We conclude there is no reasonable probability that the jury convicted

23

English as a result of its fears and passions, improperly aroused by the prosecutor, and not because of the overwhelming evidence guilt.

{¶76} Finally, English claims prosecutorial misconduct occurred during jury selection. The prosecutor, when introducing the trial process and the general facts of the case to the jury, stated, "we don't know what [defense counsel] thinks the evidence is going to show. She does not have to tell us, and that's totally fair and within the rules. But we don't know what her case theory is. We'll find out when you find out."

{¶77} Defense counsel did not make a contemporaneous objection, waiting instead until the following day. At that time, defense counsel asserted that the prosecutor had "impli[ed]" that "[I] was doing something improper by not providing [the state] a theory of the defense." The trial court overruled the objection, finding that if the prosecutor was implying anything improper, it "certainly [was] not enough to affect the jury."

{¶78} It is improper for counsel to denigrate opposing counsel in the jury's presence. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 167. We do not condone the prosecutor's unnecessary comment. But the record reflects that it was, in context, a spontaneous reaction, upon learning that the trial would start that day, as the defendant confirmed on that date the waiver of his right to discovery because he wanted to be tried "right away." And the prosecutor was explaining, apologetically, that the state may be reviewing with potential jurors what turned out to be irrelevant topics such as self-defense. We cannot say that these remarks had any impact on the verdicts. The trial court was in the best position to gauge potential prejudice from the prosecutor's comment and found none. The

comment during voir dire did not pervade the entire trial, and the jury was subsequently repeatedly told that the defense did not have any burden at trial.

{¶79}   Under these circumstances, we conclude that there is no basis for disturbing English's conviction on the grounds of prosecutorial misconduct. The fourth assignment of error is not well taken and is overruled.

## Admission of Facebook Postings

{¶80}   In his fifth assignment of error, English argues that the trial court erred by admitting into evidence Facebook postings that were attributed to him. These posting were admitted after Ebony testified to her knowledge of Facebook, and that she had set up English's Facebook account at his request in 2011, kept in touch with him through Facebook, and had seen the postings on his page.  He contends the postings were never properly authenticated, that they contained hearsay, and that their admission violated his constitutional right to confront witnesses against him. We disagree.

{¶81}   The standard for authentication of evidence, including these Facebook printouts, is low and was met in this case.  *See State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-13-1223, 2015-Ohio-1679, ¶ 46-47, cited in *State v. Gordon*, 2018-Ohio-2292, 114 N.E.3d 345, ¶ 69 (8th Dist.).  The proponent must present "evidence sufficient to support a finding that the matter in question is what the proponent claims."  Evid.R. 901(B)(1).  Testimony by a witness with knowledge "that a matter is what it is claimed to be" is an acceptable method of authentication. Here, where Ebony presented detailed testimony explaining how the account was opened for English using the moniker "Ju-Ju Williams," and that she had received communications from English through that account as recently as late June 2018, the trial court did not abuse its discretion by admitting the postings as evidence over

25

defense counsel's objection. *See Gibson* at ¶ 70. Further, the statements in the postings were statements by English, thus their admission did not violate the rules of hearsay or English's right to confront witnesses. Consequently, English has failed to demonstrate that the trial court erred by admitting the challenged Facebook postings. The fifth assignment of error is overruled.

### Viewing of Defendant in Handcuffs

{¶82} The sixth assignment of error involves English's claim that he was denied a fair trial because the jury allegedly saw him in handcuffs in the caged area of a police cruiser during the jury's viewing of the crime scene. He contends the police car that took him to the scene was parked next to the juror van, which would have allowed the jurors to see him.

{¶83} A jury may develop prejudice against a defendant tried while shackled, and that circumstance should be avoided when possible. *State v. Kidder*, 32 Ohio St.3d 279, 285, 513 N.E.2d 311 (1987). But it is well accepted that the danger of that prejudice "is slight" where a juror's view of a defendant in custody is "brief, inadvertent and outside of the courtroom." *Id.* at 286.

{¶84} This issue was first raised in English's postverdict motion for a mistrial, after the jurors had been dismissed. The lateness of the motion eliminated the trial court's chance to cure the alleged error by conducting a further voir dire of the jurors. While the record establishes that the jurors had the opportunity to view English, it is devoid of evidence demonstrating any juror actually observed him or any prejudice resulted from this opportunity. The danger of prejudice from such a viewing was very low, *id.* at 286, and English indicated that he "ducked" so he would not be seen. Consequently, we overrule the sixth assignment of error.

Ineffective Assistance of Counsel

**{¶85}**     In his seventh assignment of error, English argues he was denied the effective assistance of trial counsel because counsel failed to timely move for a mistrial after the jury had the opportunity to see him in handcuffs at the scene viewing.[1]   To prevail on a claim based on the ineffectiveness of counsel, the record must demonstrate that defense counsel's performance fell below "an objective standard of reasonable representation," and that the deficient performance prejudiced the defense so as to have deprived the defendant of a fair trial. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus, following *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶86}**     English argues that the only prudent course of action would have been to move for a mistrial after the jury returned from the scene viewing. Admittedly, this would have allowed the court the opportunity to question the jurors about English's claim that the jurors had seen him in handcuffs.   But English also relays that defense counsel had said to him after the viewing, "You don't want a mistrial, right?"  This indicates that counsel's inaction was tied to English's directive, well established in the record, for a trial on the charges without a delay.

**{¶87}**     We need not address the deficient-performance prong of English's ineffective-assistance-of-counsel claim, however, because English failed to satisfy the prejudice prong.   Any inadvertent and brief sighting of English in restraints by the jury, while English was in the back seat of the police cruiser during the jury's view of

---

[1] English's reply brief contains other examples of defense counsel's alleged ineffectiveness.   These new arguments do not rebut the state's response to the assignment of error. *See* App.R. 16.1(C). The state has not had an opportunity to address these new arguments.   Accordingly, we do not address them.

the scene, did not affect the outcome of this trial. Accordingly, we overrule the seventh assignment of error.

## Irregularity with Receipt and Sharing of Verdicts

{¶88} English's first assignment of error involves an alleged irregularity that occurred with the trial court's receipt of and sharing of the verdict. According to English, the verdicts were returned to the trial judge in the jury room, then shared with the prosecutor, and not first returned in open court in his presence. He argues this irregularity violated R.C. 2938.11(F),[2] Crim.R. 31(A),[3] and his constitutional rights to a public trial and to be present at all critical stages of the proceedings.

{¶89} Although the alleged irregularity did not contribute to the guilty verdicts, which were confirmed by jury polling, English argues the irregularity requires a reversal of his convictions because it amounted to structural error. Structural error "means [] that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.' " *Weaver v. Massachusetts*, ___ U.S. ___, 137 S.Ct. 1899, 1910, 198 L.Ed.2d 420 (2017), citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

{¶90} To prevail on his claim of structural error, English must, as a threshold matter, show the violation of a fundamental constitutional right; a violation of a statute or rule of procedure will not suffice. *See State v. Jones*, Slip Opinion No. 2020-Ohio-3051, ¶ 2, citing *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 18.

---

[2] R.C. 2938.11(F) provides that "[a]ny verdict arrived at by the jury, or finding determined by the judge or magistrate in trial to the court, shall be announced and received only in open court as soon as it is determined."

[3] Crim.R. 31(A) provides that "[t]he verdict shall be unanimous. It shall be in writing, signed by all jurors concurring therein, and returned by the jury to the judge in open court."

{¶91}   The alleged irregularity occurred on the first full day of jury deliberations.  The transcript of proceedings shows that the trial judge, accompanied by a court reporter, was in the jury room based on the agreement of the parties to answer a jury question involving juror anonymity and safety after the trial.  The judge provided the agreed-upon answer to the jurors, and told them to continue deliberations and notify the court when finished.  In response, multiple jurors said, "[w]e are finished."  Then the following transpired:

The Court:  Okay.  Well, tell me when you have the final verdict forms.

Various jurors:  We do.

The Court:  Okay.  Can I have them, then, and we'll –

Jury foreman:  Yes.

The Court:  Okay.  I'll show them to the attorneys.  Thank you.

{¶92}   The transcript next contains a notation in parenthesis that "[t]he Court and the court reporter exit the jury room and return to the courtroom," followed by, "[t]he jury entered the courtroom."  And then the following:

The Court:  Mr. Foreman, have you reached a verdict?

Jury Foreman * * *: Yes, Your Honor.

The Court:  If you could hand the verdict to the bailiff, please.

Mr. Bailiff, if you could read the verdicts please.

{¶93}   The bailiff then read the guilty verdicts into the record.  The jury was polled at defense counsel's request, and all jurors indicated that the verdicts were true.  The court entered the guilty findings and thanked and dismissed the jurors.

{¶94}   English filed a motion for a new trial two days later.  In that motion, defense counsel asserted, "upon information and belief," that after the jury had

advised the trial judge that they had reached a verdict, "the Judge took the verdict forms from the jury, left the jury in the jury room, responded to the courtroom and shared those verdict forms with the prosecuting attorney—not defense counsel. Defense counsel was then notified that there was a verdict not what the verdict was."

{¶95} Although English contends his constitutional rights to a public trial and to be present were violated, he has failed to demonstrate the factual basis for the claimed constitutional violations. One part of the transcript suggests that the trial judge took the verdict forms from the foreman in the jury room. But subsequent notations suggest that the judge did not do so at that time, because when the jury entered the courtroom, the judge instructed the foreman to hand the verdict to the bailiff. Further, while the transcript indicates that the judge said he was going to "show" the verdict forms to counsel, other evidence indicate that the judge did not mean "show" in its literal sense. To that end, in the motion for a new trial, defense counsel relayed that the judge had merely "*notified*" her that there was a verdict before those verdicts were read in the courtroom. Defense counsel also conveyed her belief that the judge had already told the prosecutor about the content of the verdicts, but she did not explain the basis for her conjecture. The record contains no comment from the prosecutor or the trial judge as to the facts, and we are left with defense counsel's speculation of an irregularity.

{¶96} The trial court's order denying the motion for a new trial provides no reasoning for its decision. But we can presume that the trial court came to the same conclusion that we are reaching—English's claim simply was not supported. *See State v. Phillips*, 74 Ohio St.3d 72, 92, 656 N.E.2d 643 (1995) (Noting that a reviewing court generally presumes regularity in the trial court, unless the record demonstrates otherwise.). Ultimately, the record fails to demonstrate that the

verdict was first announced in private and when English was not present, threshold facts for establishing the claimed constitutional violations and triggering any structural-error analysis. Accordingly, we overrule the first assignment of error.

## *Batson* Challenge

{¶97} In his second assignment of error, English argues the trial court erred during jury selection by allowing the prosecutor to use a peremptory challenge to remove an African-American potential juror, in violation of the prohibition against racial discrimination set forth in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.69 (1986). *Batson* created a three-part test for determining whether the state's use of a peremptory challenge is discriminatory. "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Snyder v. Louisiana*, 552 U.S. 472, 476-477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), quoted in *Foster v. Chatman*, ____ U.S. ____, 136 S.Ct. 1737, 1747, 195 L.Ed.2d 1 (2016).

{¶98} English's argument implicates the third step of *Batson*. The inquiry during this step of a *Batson* challenge involves a review of all the circumstances bearing on the issue of discriminatory intent. *Foster* at 1748. A trial court's ruling on the issue of discriminatory intent will be accepted on appeal unless it is "clearly erroneous." *Flowers v. Mississippi*, ____ U.S. ____, 139 S.Ct. 2228, 2243–2244, 204 L.Ed.2d 638 (2019); *see State v. Hernandez*, 63 Ohio St.3d 577, 589 N.E.2d 1310 (1991).

31

{¶99}     English argues the striking of prospective juror number 12 ("Juror 12"), an African-American woman, was racially motivated.  The record shows that on the first day of jury selection, Juror 12 revealed that the father of her child had been released from prison two years before for committing aggravated robbery. When asked if the child's father was still in her life, her answers indicated that he was, but only when he showed up to visit the child.  The prosecutor moved on, and questioning continued until the court concluded proceedings for the day.  At that time, the trial court instructed the potential jurors that they were to avoid discussing the case with others.

{¶100}   On the second day of jury selection, the prosecutor asked Juror 12 why she had responded "unknown" to several inquiries on the juror questionnaire. This included a question about whether she or members of her family had been charged with a crime, were a victim of a crime, or were involved in a lawsuit.  With respect to that question, Juror 12 explained that she had a large family and had not known the history of her older relatives when she filled out the questionnaire.  She then offered that she had asked her aunt for information and had learned "yesterday" that her uncle had served a lengthy prison sentence.

{¶101}   After this questioning, the prosecutor passed for cause.   Defense counsel subsequently questioned the prospective jurors and passed for cause.  When peremptory challenges started, the prosecutor indicated that he wished to challenge Juror 12, and defense counsel raised a *Batson* challenge.   The prosecutor then provisionally asked if he could amend his request to make a for-cause challenge, alluding to Juror 12's statement about conversing with her aunt the previous day. The prosecutor explained, "I know the court was definite, and I think the jurors understood, that they really can't talk to anybody about the case while it's pending

about anything discussed in here. And she said today she talked to a family member * * * about whether anybody else had been incarcerated, and I think that's a clear violation of her oath."

{¶102} Defense counsel indicted that she "thought" Juror 12 said that she had "called [her aunt] when she was filling out her questionnaire, * * * before she got the instruction," but she "was not sure" and "maybe misheard."

{¶103} The trial court apparently misheard the prosecutor's reasoning behind the challenge, responding with, "[because] somebody has somebody locked up * * * [t]hat doesn't necessarily mean they're going to be one way or the other," and it was not a "reason for a cause challenge."

{¶104} No further inquiry was made as to Juror 12's conversation with her aunt, including when it had occurred. The court proceeded by evaluating the prosecutor's removal request as a peremptory challenge, and the prosecutor cited Juror 12's on-going relationship with her child's father as a race-neutral reason in support. He explained, "I think there's a closeness between that event and somebody else charged with a violent felony, and for that reason I don't think she could be fair."

{¶105} Defense counsel argued that "all her answers were appropriate" and suggested that having a relationship with someone who had been incarcerated did not make one biased. The trial court found no discriminatory intent and dismissed the juror.

{¶106} English argues the prosecutor's claimed fear of Juror 12's partiality due to her relationship with the father of her child was pretextual. He claims the discriminatory intent is demonstrated by the prosecutor's provision of a factually inaccurate reason in support of removal for cause—Juror 12's discussion with her aunt. While the offering of multiple and factually inaccurate reasons may be an

33

indicator of discriminatory intent, *Foster*, ___ U.S. ___, 136 S.Ct. at 1757, 1754, 195 L.Ed.2d 1; *Flowers*, ___ U.S. ___, 139 S.Ct. at 2250, 204 L.Ed.2d 638, the inference of pretext is not strong in this case. The prosecutor's first proposed reason for removing Juror 12—that she had violated her oath by discussing the case with a relative—was substantiated to some degree by facts in the record. Further, there is no dispute about the facts concerning the relationship that led the prosecutor to be concerned about Juror 12's impartiality.

{¶107} To further support his claim of pretext, English cites the trial court's disallowance of a cause-based challenge based on Juror 12's relationship with her child's father. We are not persuaded. The trial court's earlier rejection of this reasoning was not a statement about the prosecutor's credibility, but instead a reflection on the limited grounds for cause-based dismissals. *See State v. Murphy*, 91 Ohio St.3d 516, 529, 747 N.E.2d 765 (2001), citing *Batson*, 476 U.S. at 97, 106 S.Ct. 1712, 90 L.E.2d 69 ("[a] valid explanation for a peremptory challenge need not reach the level for cause.").

{¶108} On this record, it appears that the reasons offered by the prosecution were reasonably related to responses given by the prospective juror during voir dire and that her removal was not " 'motivated in substantial part by discriminatory intent.' " *See Foster* at 1754, quoting *Snyder,* 552 U.S. at 478, 485, 128 S.Ct. 1203, 170 L.Ed.2d 175. Consequently, we conclude that the trial court's finding of no discriminatory intent was not clearly erroneous. The second assignment of error is, accordingly, overruled.

## Cumulative Error

{¶109} In his final assignment of error, English contends that all of the above assigned errors prove cumulative error that resulted in an unfair trial, entitling

him to a reversal of his convictions. This court may reverse a conviction where the cumulative effect of errors deemed harmless separately result in an unfair trial. *See State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 277, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223.

{¶110} Here, upon our review of the record, including the overwhelming evidence of guilt, we conclude that none of the errors committed in this case, singularly or together, resulted in prejudicial error. Accordingly, we overrule the tenth assignment of error.

## Conclusion

{¶111} For the foregoing reasons, we affirm English's convictions.

Judgment affirmed.

**ZAYAS, P.J.**, and **CROUSE, J.**, concur.

Please note:
The court has recorded its own entry this date.