[Cite as *State v. Whyte*, 2024-Ohio-5894.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                      :         APPEAL NO.    C-240096

            Plaintiff-Appellee,       :         TRIAL NO.      B-2203081-A

    vs.                               :

                                            :           *O P I N I O N*

PHAZION WHYTE,              :

            Defendant-Appellant.     :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From is: Affirmed

Date of Judgment Entry on Appeal: December 18, 2024


*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,


*Timothy J. McKenna*, for Defendant-Appellant.

**ZAYAS, Judge.**

{¶1} Following a jury trial, Phazion Whyte was convicted of murder with gun specifications. In three assignments of error, Whyte argues that his conviction is not supported by sufficient evidence and is contrary to the manifest weight of the evidence, and that he was denied the effective assistance of counsel. For the following reasons, we affirm the judgment of the trial court.

## Factual and Procedural History

{¶2} On May 7, 2022, Mikail was shot and killed while sitting in a vehicle parked outside of a Speedway gas station. Forest Park Police Officer Kyle Bouley testified that he responded to Speedway around 2:20 a.m. He observed Mikail's father ("father") and Mikail's father's girlfriend ("girlfriend") tending to Mikail who was in the backseat of a BMW. Bouley could not locate a pulse and noted that Mikail was not breathing.

{¶3} Girlfriend testified that she and father went to Showcase Bar and Grill ("Showcase") to pick up Mikail at approximately 10 p.m. While girlfriend and father were having a drink with Mikail, they were informed that Mikail's brother ("brother") was outside arguing with a woman, who was later identified as codefendant Jones. They went outside and saw the two arguing while Jones was on the phone. Brother got into his car, a gray Nissan, and girlfriend observed a blue Jeep follow brother. The Jeep followed brother to the Shell gas station across the street. Girlfriend, father, and Mikail drove to Shell while the Jeep circled the parking lot. Mikail got out of the car, but girlfriend could not hear what he said. When he returned to the car, father drove them to the Cruise Inn Bar. They parked in front of the bar, had a few drinks, and listened to music.

{¶4} They left the bar close to 2:00 a.m. and drove to Speedway so father

could get a soda. After father went into the store, girlfriend bent down to look into her purse, when she heard gunshots. She jumped out of the car screaming. Girlfriend did not see who shot Mikail.

**{¶5}** Father testified that his son Mikail called him to pick him up at Showcase because brother had gotten into an altercation with Jones. Mikail and brother had gone to Showcase together. Father picked up girlfriend from work and met his sons at Showcase. While father was enjoying a cocktail with Mikail and girlfriend, the bar owner informed him that brother was outside arguing with a woman. When he went outside and saw the argument, father told brother to get in his car and leave. Father noticed a blue Jeep following brother to the Shell station and initially believed the driver was an undercover officer. Mikail got into the backseat of father's car, and they went to Cruise Inn Bar and then to Speedway.

**{¶6}** As father was leaving Speedway, he heard gunshots and saw a tall person with brown skin and braids wearing a black hoodie, jeans, and gym shoes. Father testified that he got a clear picture of the shooter's face and identified Whyte as the shooter. On cross-examination, father admitted that his testimony was the first time he provided a description of the shooter. During a police interview, father told the officer he "saw a flash of a guy walking to the car" wearing a hoodie. Father was escorted to the police station after the shooting but was too emotionally upset to speak with the police. That night, father was admitted to the hospital with high blood pressure and a mental breakdown.

**{¶7}** A security guard, who was working outside security at Showcase, testified that he assisted bar security with removing two black men, who he later learned were brothers Mikail and brother, from Showcase. Jones, who was on the phone, followed the brothers out of the bar and continued to yell and scream at brother

for 15 to 20 minutes. She was very angry and threatened brother, who got into a Nissan after a gentleman in a BMW convinced him to leave. The security guard noticed a metallic blue Jeep drive without its lights on and park close to the BMW. Once the Nissan left Showcase, the Jeep reversed and followed the Nissan to the Shell station across the street. The Nissan drove around the parking lot followed by the Jeep.

{¶8} A second security guard testified that two men had an altercation with a female inside the bar that was moved outside. The woman came outside and continued to aggressively argue with the men. The second guard, who obtained brother's identification, observed that brother was "pretty upset." The woman was making threats and speaking on the phone the entire time. Eventually, she went to her car. Brother got into his car, and father convinced brother to leave the parking lot. When brother left, a Jeep pulled out behind him and followed him.

{¶9} Detective Rebecca Davis of the Forest Park Police Department testified that she took photos of items found during the search at Jones's home. Davis identified a photo of an empty handgun case found under the bed. Davis also photographed a long rifle that was found in the home. Davis testified that Jones was arrested in August 2022 and charged as a codefendant.

{¶10} Jones testified that she was living with her two children and her fiancé, Phazion Whyte, in May 2022. Jones testified that she was charged with murder and felonious assault as an accomplice. She was present for the shooting, but she was not the shooter. Jones admittedly hoped to receive a lesser sentence in exchange for her testimony, but no promises had been made to her.

{¶11} On the night of the murder, Jones had gone to Showcase to have drinks with her friend. The two were exotic dancers who had been booked to dance at a party down the street at DJ's Bar and Grill. While having cocktails in the bar, brother

approached her and spoke with her. She told him that she was in a relationship. When brother made additional comments, Jones responded that if he wanted to discuss her fiancé, they could speak outside. Jones testified that brother was yelling and upset, so they went outside. He continued to yell and wanted to speak with her fiancé. They shouted back and forth, and Jones told him he could call Whyte. Then, brother was escorted off the premises by security and continued to yell in the parking lot.

{¶12} At some point, Jones called Whyte via Facetime to tell him about the altercation. Whyte wanted to see brother, so she flipped her camera so Whyte could see him. Jones went back into the bar and was approached by Mikail, who began yelling at her to stop arguing with his brother. Brother got into a grey car and went to the Shell station. Jones and her friend got into her Jeep and followed him to Shell. Jones's friend knew brother, so they followed him to speak with him.

{¶13} When they pulled up next to brother, he immediately pulled off and circled the gas station. Jones followed him around the gas station and onto the street. Father, in his BMW, drove in front of her Jeep and stopped, and Mikail exited from the passenger side of the car. When Mikail started yelling, Jones left and drove to DJ's Bar and Grill. As her friend and she were entering the bar, Whyte called her and asked her to come home.

{¶14} When Jones arrived home, Whyte got into the driver's seat, and they drove to his friend Darrion's home. When they arrived, Darrion was outside of his car with the car running. Whyte and Darrion stood in the parking lot talking for almost ten minutes. Then both cars left and drove to Cruise Inn Bar. They parked toward the back of the bar, and Whyte walked toward the bar.

{¶15} Whyte returned to the Jeep and sat in the passenger seat. Whyte told Jones to follow Darrion. Darrion drove to Speedway, and she pulled into the parking

lot next to Speedway. Whyte put his hoodie up, exited from the car, and walked toward Speedway. Within two minutes, Jones heard multiple gunshots. Whyte called her to pick him up, and when he entered the car, he told her to "drive straight and calm." Whyte instructed her to drive to Winton Woods Park. As she drove through the park, Whyte rolled down his window and threw a gun out of the window.

{¶16} The next morning, they drove to the airport. Jones did not want to stay in Cincinnati after the shooting, so they went to Florida for ten days. On the way to the airport, Whyte took her cell phone and his, broke them, and threw them into the river. One of the phones landed on a sidewalk, and one landed in the river. Within days of returning home, they broke up, and Whyte moved in with his mother.

{¶17} In July 2022, Detective Robb questioned her at her home about the murder. A month later, Jones was interviewed by Detectives Carnine and Robb, and Jones was not forthcoming during that interview. In February 2023, Jones and her attorney met with both detectives at the jail. Jones told Robb everything that happened that night, including that Whyte was the shooter. Jones showed Detective Robb where she thought Whyte threw the gun, but the gun was never recovered.

{¶18} Jones was shown a video of the Cruise Inn Bar parking lot and identified her Jeep and Darrion's car circling the parking lot. Jones explained they were searching for the black BMW, but she did not know that Whyte wanted to kill the man from Showcase. The video depicted the Jeep parking and Whyte exiting from the vehicle. Whyte returned to the Jeep, and instructed Jones to follow Darrion's car. As the two cars were leaving the parking lot, the black BMW was visible. Jones identified Whyte as the shooter.

{¶19} Forest Park Police Officer Jeff Carnine testified that his role in the investigation was to analyze cell phone records. He explained that he obtains raw cell

phone data from cell carriers and inputs the data into a program called CellHawk. The program maps the towers that a phone was connected to during calls, texts, and data transmission.

**{¶20}** Carnine obtained Whyte's data from Verizon and analyzed the data associated with Whyte's phone number that ended in 5337. The subscriber for the phone had the last name of Whyte, and Whyte was an authorized user of the phone number. On May 7, 2022, between 12:25 a.m. and the time of the homicide, 16 calls were made between Whyte's and Jones's phones. There was a 25-minute call that began at 12:35 a.m. and ended at 1:00 a.m. Less than a minute later, a 38-second call from Jones to Whyte, and two minutes later, a call that lasted 139 seconds from Whyte to Jones. Video from Showcase confirmed that Jones was on her phone at 12:35 a.m.

**{¶21}** At 12:41 a.m., Whyte's phone called Jones's phone, and the call lasted 74 seconds. A minute and a half later, a 66-second call was made from Jones to Whyte. The next call was from Whyte to Jones at 12:50 a.m., lasting 95 seconds. Numerous calls between the two occurred between 1:02 a.m. and 1:21 a.m. They did not communicate for the next hour and three minutes. At 2:24 a.m., Whyte's phone called Jones's phone. Prior to the homicide, Whyte's phone connected to the two towers closest to the home he shared with Jones. At 2:26 a.m., Whyte's phone was within a short distance from Speedway and Cruise Inn Bar. Mikail was shot at 2:23 a.m., and 45 seconds later, Whyte called Jones, and the phone connected to a tower close to Speedway.

**{¶22}** Carmine also analyzed the data related to Jones's number, ending in 7722, that he obtained from T-mobile. The subscriber was Phazion Whyte. Jones called Whyte 15 times that night. Jones's records indicated that she left Showcase, traveled to her home, and then went to Cruise Inn Bar. Jones's phone connected to

the tower closest to Speedway when Whyte called her at 2:24 a.m. Between 2:04 and 2:08 a.m., her phone was in the area of Cruise Inn Bar. Her phone traveled from Cruise Inn Bar to Speedway and was at or near Speedway at 2:23 a.m. Shortly after the shooting, Jones's phone and Whyte's phone were close to Speedway. Whyte's phone was less than a mile from Speedway at 2:26 a.m.

{¶23} On cross-examination, Whyte questioned why Carmine's map did not show Jones's and Whyte's phones overlapping immediately after the shooting. Carmine explained that Jones and Whyte had different cell phone providers that use different towers. Because their phones would not use the same towers, their phones would not overlap on the map.

{¶24} Detective Mike Robb, a detective with the Forest Park Police Department, was assigned to investigate the homicide. He responded to Speedway after the shooting and had patrol secure the video from all of the Speedway cameras. Two days after the shooting, Robb received information from two different sources implicating Whyte. Robb obtained Whyte's cell phone records to determine if he was near the shooting. Based on Whyte's cell phone records, Robb obtained Jones's cell phone records. Jones's records confirmed that Jones was in the crime area that night, and she was in contact with Whyte prior to and directly after the shooting.

{¶25} In May 2022, Robb went to the home of Jones and Whyte and conducted a trash pull. Robb found mail confirming that Jones lived at the home. In July 2022, Robb executed a search warrant at the home.

{¶26} Surveillance cameras led him to a blue Jeep, and Robb also received information that Jones drove that blue Jeep. Robb went to speak with Jones at her home on July 5, 2022. Robb learned that Jones was involved in an argument that night, but she was not forthcoming with information. In August 2022, Robb

interviewed Jones at the Springdale Police Department, and she was honest about information that did not incriminate her. His final interview with Jones occurred in February 2023. Robb met with Jones and her attorney at the jail. During that interview, she gave helpful information that corroborated the surveillance video and cell phone data Robb had previously obtained. Jones was unsure of her driving route after the shooting, but she remembered driving on Lakeshore Drive, which goes through Winton Woods. The gun was thrown out of the car during the drive on Lakeshore, but the area where the gun was thrown was very large.

{¶27} Robb also listened to jail calls, and two jail calls made by Whyte were admitted, one from August 19, 2022, and one from September 19, 2022. In the first call, Whyte stated that he wanted a speedy trial because Jones "can't hold water." Based on that call, Robb interviewed Jones, who decided to cooperate with him. During the second call, Whyte expressed his belief that Jones was not cooperating because her case had not been severed from his, and that he had to keep her close to him to prevent her from cooperating.

{¶28} After Robb's testimony, both parties rested, and the case was submitted to the jury. The jury found Whyte guilty of all charges and gun specifications.

### Sufficiency and Manifest Weight

{¶29} In his first and second assignments of error, argued together, Whyte contends that conviction for murder was not supported by sufficient evidence and was contrary to the manifest weight of the evidence. Specifically, Whyte claims that the State failed to prove that he was the shooter because Jones's testimony was unreliable, father's in-court identification of Whyte was not credible, Whyte's cell phone records show that his phone was not at Speedway at 2:25 a.m., and the state presented no physical evidence, such as DNA or fingerprints, tying him to the crime.

**{¶30}** In reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime had been proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶31}** When considering a weight-of-the-evidence claim, we review "'the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Bailey*, 2015-Ohio-2997, ¶ 59 (1st Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997).

**{¶32}** The credibility of the witnesses is an issue for the trier of fact to resolve. *See State v. Issa*, 93 Ohio St.3d 49, 67 (2001). We must afford substantial deference to its credibility determinations because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses. (Citations omitted.) *See State v. Roland*, 2021-Ohio-4077, ¶ 23 (1st Dist.). A conviction is not against the manifest weight of the evidence simply because the factfinder believed the prosecution testimony. *Id.*

**{¶33}** Whyte contends that the State failed to sufficiently or credibly prove that he was the individual who shot Mikail because Jones's and father's testimony was not credible, his cell phone records show that his phone was not at Speedway at 2:25 a.m., and the State presented no physical evidence tying him to the crime.

**{¶34}** With respect to the lack of physical evidence, the gun was never recovered and no fingerprints or DNA evidence could be obtained from the crime

scene. However, the State is not required to present physical evidence or recover a weapon to satisfy its burden of proof. *See State v. English*, 2020-Ohio-4682, ¶ 29 (1st Dist.).

**{¶35}** The testimony of the cell phone expert established that both Jones and Whyte were close to Speedway at the time of the shooting. At 2:26 a.m., Whyte's phone was within a short distance from Speedway and Cruise Inn Bar. Mikail was shot at 2:23 a.m., and 45 seconds later, Whyte called Jones, and the phone connected to a tower close to Speedway. Whyte argues that his phone data did not show that his phone overlapped with Jones's phone less than two minutes after the shooting. Whyte misstates the testimony of the expert. The expert explained that the phones would not overlap because each had a different cell phone provider that used different towers. Although Carnine could not determine the exact location of Whyte's phone, he testified that Whyte's phone connected to the tower close to the crime scene.

**{¶36}** Jones admitted her involvement in the shooting and testified that she drove Whyte to the business next to Speedway, and Whyte got out of the car and walked to Speedway. Shortly thereafter, Jones heard multiple gunshots and Whyte called her to pick him up. After being shown video of the Speedway shooting, Jones recognized and identified Whyte as the shooter. Father also testified that Whyte shot his son. Although father acknowledged that he did not provide a description of the shooter until he testified, father explained that he was so traumatized by the shooting, he was admitted to the hospital with a mental breakdown. In finding Whyte guilty, the jury found the testimony to be credible. Because credibility is an issue for the trier of fact to resolve, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice.

**{¶37}** Viewing the evidence in a light most favorable to the State, we cannot

say that the State presented insufficient evidence to establish that Whyte shot and killed Mikail. This is not an exceptional case in which the evidence weighs heavily against the conviction.

**{¶38}** We overrule the first and second assignments of error.

### Ineffective Assistance of Counsel

**{¶39}** In his third assignment of error, Whyte asserts that he was denied the effective assistance of counsel because counsel failed to procure the expert testimony of a crime scene reconstructionist to show Whyte was not the shooter.

**{¶40}** To prevail on an ineffective-assistance-of-counsel claim, Whyte must show that trial counsel's performance fell below an objective standard of reasonableness, and he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687-688, 693 (1984). To demonstrate prejudice, Whyte must establish that, but for counsel's errors, there is a reasonable probability that the result of trial would have been different. *See State v. Patton*, 2021-Ohio-295, ¶ 29 (1st Dist.). The failure to make an adequate showing on either prong is fatal to an ineffective-assistance-of-counsel claim. *See Strickland* at 697.

**{¶41}** Whyte argues his counsel was ineffective for failing to call a crime scene reconstructionist to present expert testimony. In general, "the decision not to call an expert witness does not constitute ineffective assistance of counsel because that decision is solely a matter of trial strategy." *Patton* at ¶ 30. Any testimony that a reconstructionist would have provided is purely speculative. Whyte has not demonstrated that the outcome of the proceedings would have been different had his counsel hired such an expert. *See id.* at ¶ 31.

**{¶42}** Accordingly, we overrule the third assignment of error.

## Conclusion

**{¶43}** Having overruled Whyte's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**BOCK, P.J.,** and **KINSLEY, J**., concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.